31 Kan.App. 2d 658 (2003)
70 P.3d 700
In the Interest of J.D.
No. 89,942
Court of Appeals of Kansas
Opinion filed June 13, 2003.
*659 Gary Ellis, of Kansas Department of Social and Rehabilitation Services, of Manhattan, for appellant.
Terry D. Holdren, assistant county attorney, for appellee.
Sarah J. Sargent, of Topeka, for amicus curiae Kansas Children's Service League.
Sheila P. Hochhauser, of Patrick Caffey, P.A., of Manhattan, for amicus curiae former adoptive parents.
Before BEIER, P.J., LEWIS and JOHNSON, JJ.
BEIER, J.:
This appeal requires us to examine the source and extent of court power to control placement of a child whose parents voluntarily relinquish their parental rights during the course of a child in need of care (CINC) proceeding.
The Kansas Department of Social and Rehabilitation Services (SRS) appeals the district court's ruling that J.D., a child who had previously lived in Manhattan with his adoptive family, could not be placed with a foster family in that geographic area after his adoptive parents voluntarily relinquished their parental rights. The State of Kansas is the appellee. We also are assisted in our review by amicus curiae briefs from the Kansas Children's Service League (KCSL) and from J.D.'s former adoptive parents.
SRS challenges the district court's subject matter jurisdiction, argues that the district court lacked statutory authority for its placement decision, and contends the district court violated J.D.'s constitutional rights to due process and equal protection.
We will address each of these issues in turn, but a brief recitation of the pertinent facts is necessary to a full understanding of our opinion.
A CINC proceeding was launched in this instance with the cooperation of J.D.'s adoptive parents, because of a long-term pattern of violent behavior by J.D. while he was in their care. J.D. destroyed property, harmed himself, and attempted to harm other members of the family.
At the first hearing on the CINC petition, temporary custody of J.D., then age 13, was assigned to SRS. The agency placed him in a foster home and then in a group home, both outside of Manhattan. *660 J.D. was represented by a guardian ad litem at his initial hearing, and SRS, although not a party, had counsel present as well.
At a later pretrial hearing, the parties stipulated that J.D. was a child in need of care. By that time, the district judge had explained that he was acquainted with J.D.'s adoptive family. No objection was raised to the judge's participation in the case.
A short while later, J.D.'s adoptive parents voluntarily relinquished their parental rights, pursuant to the Kansas Adoption and Relinquishment Act (KARA), K.S.A. 59-2111 et seq. See K.S.A. 59-2124. SRS formally accepted the relinquishment at a dispositional hearing, and the district court ordered the case to remain open until further notice.
A permanency hearing followed several months later. The resulting journal entry recited that it had been held pursuant to K.S.A. 38-1565 and K.S.A. 38-1584. Again, an SRS representative had been present at the hearing. The district court found reasonable efforts had been made to accomplish a permanency goal, approved a permanency plan, and continued its previous orders.
When J.D. was successful in adjusting to the group home, SRS placed him in a Manhattan foster home. By this time, he was well past his 14th birthday.
Shortly after his move back to Manhattan, J.D. telephoned his former foster family several times. On one occasion, he spoke with his former adoptive parents' 16-year-old son, saying he would see him at school. Within a couple of months, the former adoptive parents had sent the district judge a letter expressing their displeasure with J.D.'s placement and telephone calls. In response to this letter, the district court scheduled a hearing to review J.D.'s situation.
At the hearing, the former adoptive parents testified under questioning from their counsel. They stated that the members of their family lived in constant fear that J.D. would act on earlier threats he had made against them. They were particularly concerned about the possibility that J.D. would attend high school with their 16-year-old son, who had been a victim of J.D.'s earlier violence. They asked the court to have J.D. placed outside of Manhattan.
*661 J.D.'s social worker at KCSL, Tanya Draper, testified that J.D.'s Manhattan foster home was the only placement available to him after a statewide computerized search. Before he moved there, Draper said, her supervisor, Draper, the SRS social worker assigned to J.D., and a foster home specialist had agreed that Manhattan was the appropriate placement for J.D. In addition, J.D.'s group home director, his guardian ad litem, and his care manager at Kansas Innovations, Inc., had been consulted.
Other evidence supported Draper's optimism, indicating that J.D. was doing fairly well in his current Manhattan foster home placement. Although he had been the subject of an in-school suspension for swearing in class, his grades were improving, and he had not been involved in any physical altercations or threats.
In addition, in response to J.D.'s telephone calls to his former foster family, Draper had created a safety plan that prohibited J.D. from having further contact with the family. The plan was signed by all concerned, including J.D. and his current foster parents. Draper also said other high school options were available. Either school authorities could assist in minimizing contact between the two boys, or J.D. could attend a different school.
Draper testified that, in her opinion, J.D. should remain in the Manhattan placement because he considered the area his home community and a collaborative team had been set up to provide "wraparound" services for him. In addition, J.D. had developed a sense of belonging with his current foster parents.
Therapist Marilyn McKee also recommended that J.D. stay in the Manhattan foster family because the foster parents possessed a good understanding of J.D.'s behavior and were able to manage it effectively.
At the conclusion of the hearing, the district judge again pointed out that he was acquainted with J.D.'s former adoptive family, including the 16-year-old son. Again, no objection to the judge's participation surfaced.
The district judge ruled from the bench. He did not agree that the use of a computerized matching system constituted an extensive search for an appropriate placement and thought it was "ill-advised" to again place J.D. in Manhattan. Although the court characterized *662 SRS efforts since the placement was made as appropriate, he could not "find that a plan for [J.D.] that includes a placement here in Manhattan or the surrounding area is in his best interest. I just can't." In the written journal entry that followed, which again invoked the authority of K.S.A. 38-1584, the district judge further stated that the adoptive family's 8 years of experience leading to the relinquishment and J.D.'s telephone contacts supported his decision that it was not in J.D.'s best interests to be placed in Manhattan or its immediate vicinity.

Subject Matter Jurisdiction
SRS first argues that the court's subject matter jurisdiction over the CINC proceeding terminated once the voluntary relinquishment occurred under the KARA.
K.S.A. 59-2124(a) provides:
"Any parent or parents or person in loco parentis may relinquish a child to an agency, and if the agency accepts the relinquishment in writing, the agency shall stand in loco parentis to the child and shall have and possess over the child all rights of a parent or legal guardian, including the power to place the child for adoption and give consent thereto."
SRS argues that the legislature, through this statute, granted the right to determine placement of a relinquished child to it rather than to the court, subject only to the court's acknowledged authority to grant or deny an adoption. Further, according to SRS, the district court's reliance upon K.S.A. 38-1584(d) as authority to review the plan for J.D. was misplaced; that statute applies only to CINC proceedings leading to involuntary termination of parental rights, not to voluntary relinquishments under the KARA.
The State responds by citing K.S.A. 2002 Supp. 38-1503(c) and In re M.R., 272 Kan. 1335, 38 P.3d 694 (2002).
K.S.A. 2002 Supp. 38-1503(c) provides in pertinent part:
"When jurisdiction has been acquired by the court over the person of a child in need of care it may continue until the child: (1) Has attained the age of 21 years; (2) has been adopted; or (3) has been discharged by the court."
In In re M.R., 272 Kan. at 1339, the Kansas Supreme Court recently reinforced the three exits from CINC jurisdiction listed in the statute. The court held the district court had retained jurisdiction *663 despite finding the subject child in contempt, because none of the three statutory conditions for terminating subject matter jurisdiction had been met.
What was true in In re M.R. also is true here. None of the three conditions under K.S.A. 2002 Supp. 38-1503(c) has been met, and SRS has provided no authority that subject matter jurisdiction in a pending CINC action also terminates when parental rights are voluntarily relinquished under the KARA. The court retained subject matter jurisdiction over J.D. here.

Statutory Authority
SRS next argues the district court lacked statutory authority to change the placement of J.D. after SRS had accepted relinquishment. If we conclude that the court was correct to proceed under 38-1584(d), SRS contends that the judge failed to make the findings necessary under the statute. In its view, unless SRS was not making reasonable efforts or progress toward finding a permanent home for J.D., the court could not override the agency's placement decision. See In re M.K., 31 Kan. App. 2d 24, Syl. ¶ 5, 59 P.3d 355 (2002), rev. denied 275 Kan. 964 (2003).
The State responds in several ways: First, it contends the district court substantially complied with the statutory language of 38-1584(d) and made all necessary findings. Second, it argues that K.S.A. 38-1563(e)(1) also permitted the court to make recommendations regarding placement. And, finally, it asserts that the court's directive that J.D. be placed outside of Manhattan was not so specific as to limit the ability of SRS to place him.
Both amicus briefs acknowledge that no statute, including 38-1584(d), specifically applies to a situation in which parental rights are voluntarily relinquished during the pendency of a CINC proceeding.
Although it may be true that 38-1584(d) explicitly comes into play only when there has been an involuntary termination of parental rights, we see no meaningful distinction between a child in those circumstances and one in the position of J.D. Indeed, if a CINC proceeding has already been filed when a voluntary relinquishment takes place, the situation is practically and legally identical *664 to that in a CINC proceeding where an involuntary termination has occurred. At that point, the court has a necessary and continuing role in supervising an appropriate permanency plan designed to prevent foster care "drift." See 42 U.S.C. § 675(5)(c) (2000); Gordon, Drifting Through Byzantium: The Promise and Failure of the Adoption And Safe Families Act of 1997, 83 Minn. L. Rev. 637, 650-51 (1999).
As the district judge apparently recognized, K.S.A. 38-1584(d) gives form and substance to the court's supervisory role. It reads in pertinent part:
"(d) .... After parental rights have been terminated and up to the time an adoption has been accomplished, the person or agency awarded custody of the child shall within 60 days submit a written plan for permanent placement which shall include measurable objectives and time schedules and shall thereafter not less frequently than each six months make a written report to the court stating the progress having been made toward finding an adoptive placement or permanent guardianship or placement with a fit and willing relative. Upon the receipt of each report the court shall review the contents thereof and determine whether or not a hearing should be held on the subject. In any case, the court shall notify all interested parties and hear evidence regarding progress toward finding an adoptive home or permanent guardian or placement with a fit and willing relative within 12 months after parental rights have been terminated and every 12 months thereafter. If the court determines that reasonable efforts or progress have not been made toward finding an adoptive placement or establishing an acceptable permanent guardianship or placement with a fit and willing relative, the court may rescind its prior orders and make other orders regarding custody and adoption that are appropriate under the circumstances." (Emphases added.)
From this language it is clear that the district court had to find that "reasonable efforts or progress" had not been made toward "finding an adoptive placement or establishing an acceptable permanent guardianship or placement with a fit and willing relative" for J.D. in order to "rescind its prior orders and make other orders regarding custody and adoption that are appropriate under the circumstances." K.S.A. 38-1584(d); see In re M.K., 31 Kan. App. 2d 24, Syl. ¶ 5.
Unfortunately for all concerned, the district judge did not employ this standard before upending J.D.'s placement. In both his oral remarks from the bench and the later journal entry, the judge spoke only of J.D.'s "best interests." This standard appears to have *665 been borrowed from 38-1563(e)(3), which clearly applies in advance of a termination or relinquishment. J.D.'s case had gotten far beyond that point.
For this reason, the district court's ruling must be reversed and the case remanded for a further hearing designed to determine whether reasonable efforts or progress toward finding an acceptable permanent placement for J.D. are occurring. That is the lens through which the available evidence should be viewed. If the district court determines that SRS is not meeting this standard, it may rescind its prior orders and make other orders regarding custody that are more appropriate for J.D. under the circumstances.
We next address whether, on remand, the district court's power to rescind prior orders and make new ones will include the power to order that J.D. be placed outside of Manhattan and its immediate vicinity.
The parties seem to agree that the district court does not have the power to direct a specific placement under In re C. C., 19 Kan. App. 2d 906, 878 P.2d 865, rev. denied 255 Kan. 1002 (1994). In that case, a panel of this court interpreted K.S.A. 38-1563(e), stating: "When the custody of the child is awarded to the [SRS] ... [t]he court may recommend to the Secretary where the child should be placed, but the court shall not have power to direct a specific placement." 19 Kan. App. 2d at 908.
At least two problems arise with reliance on this case, however. First, K.S.A. 38-1563(e) was subsequently amended, and the language upon which the panel relied for this holding was deleted. Second, as mentioned above, this statute was designed to apply at an earlier stage of CINC proceedings, i.e., before termination of parental rights. Thus In re C.C. cannot circumscribe the district court's power on remand in this case.
The applicable limits of the court's power must be found in the language of the standard set forth in 38-1584(d). Under that statute, if the district judge should find that placement of J.D. in the Manhattan foster home or in another setting in its immediate geographical vicinity does not qualify as reasonable efforts or progress toward finding an acceptable permanent placement for him, then he may order SRS to find an alternative placement. We do not *666 agree with SRS's assertion that such an order would qualify as banishment. The focus is not on punishing J.D. for past conduct; rather, the court's mission is to maximize his chances to overcome his problems and progress toward a responsible and self-sufficient adulthood.

Due Process and Equal Protection
SRS asserts that the district judge violated J.D.'s constitutional rights to due process and equal protection by considering the ex parte letter from J.D.'s former adoptive parents. At oral argument, counsel for SRS insisted that no copy of the letter was provided to SRS until this appeal was under way.
The State argues that copies of all written communications received by the court from J.D.'s former adoptive family were provided to the county attorney and to J.D.'s guardian ad litem, that SRS was not a party to the proceedings, that the district court was already informed of the information provided by the family when J.D. was found to a be a child in need of care, and that the family's ultimate testimony was sought by the county attorney rather than the district judge. See In re H.R.B., 30 Kan. App. 2d 599, Syl. ¶ 1, 43 P.3d 887 (2002) ("Generally, Kansas Social and Rehabilitation Services [SRS] is not an interested party in a child in need of care proceeding under K.S.A. 38-1501 et seq.") The amicus brief from the former adoptive parents adds that SRS received notice of the hearing on the Manhattan placement issue and had a representative present.
The basic elements of procedural due process are notice and an opportunity to be heard at a meaningful time and in a meaningful manner. In reviewing a procedural due process claim, we must first determine whether a protected liberty or property interest is involved. If it is, then we determine the nature and extent of the process due. Winston v. Kansas Dept. of SRS, 274 Kan. 396, 409, 49 P.3d 1274, 1283 (2002), cert. denied 537 U.S. 1088 (2002). Whether due process under the Fourteenth Amendment to the United States Constitution has been protected in a particular case is a question of law. In re Habeas Corpus Application of Pierpoint, 271 Kan. 620, 627, 24 P.3d 128 (2001).
*667 A child has a fundamental liberty interest in his or her parentage, and the rights and interests of a child in his or her parentage are due process rights that cannot be terminated or affected without notice and an opportunity to be heard. Ferguson v. Winston, 27 Kan. App. 2d 34, 39, 996 P.2d 841 (2000).
Here, J.D. was represented by his guardian ad litem throughout the CINC proceedings, and SRS concedes it was not an interested party. In spite of that fact, SRS received notice of the hearing, attended the hearing through an attorney and a caseworker, and raised no objection regarding a lack of access to the ex parte communication. Under these circumstances, J.D. was not denied his right to due process by the district court's handling of the letter and its aftermath.
SRS provides no argument in support of its equal protection assertion. An issue which is not briefed is deemed abandoned. See McCain Foods USA, Inc. v. Central Processors, Inc., 275 Kan. 1, 15, 61 P.3d 68 (2002) (litigant who fails to press point by supporting it with pertinent authority forfeits point on appeal).
SRS also attempts a late challenge to the district judge's participation in the case, arguing that he should have recused himself because of his acquaintance with the former adoptive family. Because SRS had representatives present both times the district judge mentioned this issue and raised no objection to his continuing participation, this issue has not been properly preserved for appeal. See State v. Alderson, 260 Kan. 445, Syl. ¶ 7, 922 P.2d 435 (1996). However, we agree that the appearance of a conflict created by the trial judge's acquaintance with J.D.'s adoptive family counsels in favor of a new judge on remand.
Reversed and remanded for further proceedings consistent with this opinion before a different judge.