32 Kan.App. 2d 962 (2004)
92 P.3d 1138
IN THE INTEREST OF D.C., D.O.B.: 10/13/00, A Minor Under the Age of 18 Years of Age.
No. 91,419.
Court of Appeals of Kansas.
Opinion filed July 9, 2004.
*963 Richard Shaw, of Chanute, for appellant Kansas Department of Social and Rehabilitation Services.
Dan E. Turner and Phillip L. Turner, of Topeka, for appellant foster parents.
David K. Markham, of Tucker and Markham, of Parsons, for appellees maternal aunt and uncle.
Linus A. Thuston, of Chanute, guardian ad litem.
Sarah J. Sargent, of Topeka, for amicus curiae Kansas Children's Service League.
Before RULON, C.J., ELLIOTT and HILL, JJ.
RULON, C.J.
The Kansas Department of Social and Rehabilitation Services (SRS) and L.W. and R.W., the foster parents of D.C., appeal the district court's judgment that SRS and its contracting *964 agency, Kansas Children's Service League (the League), had not exercised reasonable efforts in finding a permanent placement for D.C. and the court's order to transfer D.C. to her maternal aunt and uncle, J.P. and D.P., in Arizona. We affirm in part, reverse in part, and remand the case for further proceedings.
Shortly after D.C. was born on October 13, 2000, she was taken from her natural parents and placed with a maternal aunt, P.B., who lived in Parsons. Although the Arizona relatives expressed an interest in becoming permanent guardians of the child and an expedited home study was conducted in Arizona, SRS filed its motion to terminate the natural parents' rights to D.C. Thereafter, the natural parents relinquished their rights to the child, and the child was placed with her Parsons aunt.
The Arizona aunt and uncle expressed their wish to adopt the child, but, because SRS and the League failed to request information on the child's Native American heritage under the Indian Child Welfare Act, 25 U.S.C. § 1901 (2000) et seq., see K.S.A. 38-1339, the agencies could not move forward with the Arizona relatives' adoption request under the Interstate Compact for the Placement of Children (Interstate Compact). See K.S.A. 38-1201 et seq. Consequently, SRS, the League, and the guardian ad litem decided to terminate the Interstate Compact process for the Arizona relatives and attempted to place the child with the Parsons aunt.
The attempted adoptive placement with the Parsons aunt was unsuccessful, and the child was placed in the home of the foster parents. Thereafter, the Arizona relatives and the foster parents both sought to adopt D.C. After finally completing an adoptive placement home study through the Interstate Compact, the League held a case plan meeting at which SRS and the League unanimously decided to place D.C. with the foster parents, not the Arizona relatives.
The Arizona relatives contested the placement decision. After a full evidentiary hearing, the district court ruled that SRS and the League had not used reasonable efforts in placing D.C. because the agencies had disregarded policies regarding placement preferences for relatives of the child. The district court further ordered *965 placement of D.C. with the Arizona relatives under K.S.A. 38-1584(b)(1)(A). SRS and the foster parents appealed.

Judicial Authority to Review Placement Decision
Although the appellants argue the district court lacks authority to review a placement decision of SRS when the agency gains custody of a child through voluntary relinquishment proceedings, this court has previously rejected that argument. See In re J.D., 31 Kan. App. 2d 658, 70 P.3d 700 (2003).
"Although it may be true that [K.S.A.] 38-1584(d) explicitly comes into play only when there has been an involuntary termination of parental rights, we see no meaningful distinction between a child in those circumstances and one in the position of J.D. Indeed, if a CINC proceeding has already been filed when a voluntary relinquishment takes place, the situation is practically and legally identical to that in a CINC proceeding where an involuntary termination has occurred. At that point, the court has a necessary and continuing role in supervising an appropriate permanency plan designed to prevent foster care `drift.' [Citations omitted.]" 31 Kan. App. 2d at 663-64.
However, once the district court has ordered a child into SRS custody for adoptive placement under K.S.A. 38-1584(b)(1)(A), the court's role is limited to supervision to ensure the appointed agency diligently seeks an appropriate placement of the child. A district court's review of an agency adoption placement decision following a voluntary relinquishment is similarly limited. See In re J.D., 31 Kan. App. 2d at 664.
The appellants attempt to impose a narrow interpretation of "reasonable efforts" upon the statute, arguing that if SRS determines an appropriate placement for a child within a reasonable amount of time, the district court possesses no statutory authority to disapprove of such placement. In contrast, the Kansas Code for the Care of Children, K.S.A. 38-1501 et seq., is to be liberally construed to provide children with the care, custody, guidance, control, and discipline that will best serve the welfare of the child and the interests of Kansas. See K.S.A. 38-1501.
K.S.A. 38-1584(d) plainly allows judicial review of the agency placement process to determine whether "reasonable efforts or progress" has been made. If "reasonable efforts" encompasses only *966 the efficiency with which SRS finds suitable adoptive placements, the inclusion of the term "reasonable progress" would be rendered redundant by the term "reasonable efforts" and, therefore, rendered meaningless. It is a maxim of statutory interpretation that a court presumes that the legislature did not intend to enact useless or meaningless legislation. See In re M.R., 272 Kan. 1335, 1342, 38 P.3d 694 (2002).
"The purpose of [K.S.A. 38-1584] is to provide stability in the life of a child who must be removed from the home of a parent, to acknowledge that time perception of a child differs from that of an adult and to make the ongoing physical, mental and emotional needs of the child the decisive consideration in proceedings under this section. The primary goal for all children whose parents' parental rights have been terminated is placement in a permanent family setting." (Emphasis added.) K.S.A. 38-1584(a).
In light of this purpose, a reasonable permanent placement decision necessarily implies a decision that is in the best interests of the child under the circumstances. Efficiency of placement is but one aspect of an appropriate placement decision. The policies and procedures implemented by an agency and the manner in which those policies and procedures are implemented affect the reasonableness of an adoptive placement decision as much as the timeliness of the placement decision.
When a district court is required to make a custody placement decision after the termination of parental rights, the court must consider all of the facts and circumstances in light of the child's physical, mental, and emotional needs. In doing so, the court must give primary consideration to granting custody to a relative of the child. See In re J.A., 30 Kan. App. 2d 416, 423, 42 P.3d 215, rev. denied 274 Kan. 1112 (2002); K.S.A. 38-1584(b)(4).
The League admits that it is governed by similar considerations in making a placement decision. With respect to relative preference, "reasonable efforts" requires, at a minimum, that the agency responsible for finding suitable placement impartially consider any relatives of a child who are potential adoptive resources in a timely and consistent manner. Because SRS and the League allegedly excluded the Arizona relatives as an adoptive resource by failing to consider their application in a timely and consistent manner, the *967 district court was well within its authority to review the reasonable efforts of SRS and the League's placement determination under K.S.A. 38-1584(d).

"Reasonable Efforts" Determination
In finding that SRS and the League had not exercised reasonable efforts in the placement of D.C., the district court adopted the proposed findings of the Arizona relatives, the assistant county attorney, and the guardian ad litem. Where a district court has made findings of fact and conclusions of law, an appellate court applies a mixed standard of review. A district court's findings of fact are reviewed for substantial competent evidence, which is such legal and relevant evidence as a reasonable person might accept as sufficient to support the legal conclusions. Unrau v. Kidron Bethel Retirement Services, Inc., 271 Kan. 743, 747, 27 P.3d 1 (2001). This court possesses unlimited review of the district court's legal conclusions. Lindsey v. Miami County National Bank, 267 Kan. 685, 689-90, 984 P.2d 719 (1999).
The factual allegations leveled against SRS and the League revolve around three issues involving the implementation of the Arizona relatives' Interstate Compact process, the notification of pertinent procedures and policies with respect to the placement process, and the consistent application of evaluation criteria.

The Interstate Compact for the Placement of Children
Even before the natural parents relinquished their rights to D.C., the Arizona relatives had expressed interest in obtaining custody of D.C. as guardians. At the time, the district court approved a relative placement home study for the Arizona relatives, which involved an expedited Interstate Compact process. After D.C.'s parents relinquished their rights, the Arizona relatives expressed interest in adopting D.C. Still, the League did not send the Interstate Compact request for an adoptive placement home study to Arizona for another 10 months.
According to SRS and the League, the primary delay in completing the Interstate Compact process was the absence of Indian *968 Child Welfare Act information. Although such information is required in every agency adoption case, Interstate Compact procedures apparently demand that the agency acquire information on the child's Native American ancestry, if any, before forwarding the Interstate Compact request to the foreign jurisdiction. Yet, no Indian Child Welfare Act information was sought in this case prior to the League's entry into the adoptive process.
Nevertheless, after the parental rights to D.C. were relinquished to SRS, neither SRS nor the League attempted to obtain Indian Child Welfare Act information until April 8, 2002. This failure, especially in light of the apparent Interstate Compact requirements, cannot be deemed the exercise of reasonable efforts to include the Arizona relatives in the adoptive placement consideration. Even when the League realized that information regarding D.C.'s Native American heritage had not been obtained, the agency failed to pursue the information diligently. Rather than sending a registered letter with return receipt requested to pertinent tribes providing sufficient notice of D.C.'s history to enable a tribe to determine whether D.C. qualifies for tribal membership, as required by 25 U.S.C. § 1912(a) (2000), the League faxed the Indian Child Welfare Act requests to the pertinent tribes. A copy of the fax is not included in the record.
Had the League strictly complied with the notice requirements of 25 U.S.C. § 1912(a), the nonaffiliation of D.C. could have been presumed if the notified tribes had failed to respond within 10 days (or 30 days upon the tribe's request). See In re T.M., 245 Mich. App. 181, 187, 628 N.W.2d 570 (2001) ("If proper notice is provided and a tribe fails to either respond or intervene in the matter, the burden shifts to the parties . . . to show that [the Indian Child Welfare Act] still applies."); In re Levi U., 78 Cal. App. 4th 191, 198, 92 Cal. Rptr. 2d 648 (2000) ("[T]he lack of any response from [the Bureau of Indian Affairs], and the absence of any communication sent to [the Butte County Children's Services Division] by a tribe, were tantamount to determinations that the minor was not an `Indian child' within the meaning of the Act.").
The League's social worker, Dana Ison, admitted that a non-Indian affidavit could have been used to comply with the Indian *969 Child Welfare Act requirements for purposes of the Interstate Compact if the tribes failed to respond to a request in writing but that SRS refused to complete an affidavit in this case. The League concedes that it could have expedited the Indian Child Welfare Act request by mailing a 15-day letter to the tribes. Such a letter was mailed in July 2002. There is no indication why this letter could not have been mailed earlier so that the Arizona relatives' Interstate Compact request could have been sent to Arizona in time for them to have been considered for adoption placement in October 2002.
The appellants contend this court should not consider the reasonableness of the failure of SRS and the League to timely request Indian Child Welfare Act information because the district court specifically determined that reasonable efforts had been made toward an adoption placement on September 24, 2002, after the initial delay in seeking information on D.C.'s Native American heritage. However, because the Arizona relatives were never given notice of the September 24th hearing, they cannot be precluded from using evidence prior to the September 24, 2002, hearing to argue that the agencies' application of policies and procedures with respect to their adoption application was unreasonable. See Jackson Trak Group, Inc. v. Mid States Port Authority, 242 Kan. 683, 690, 751 P.2d 122 (1988) (discussing the elements of res judicata and collateral estoppel).
Moreover, even if this court adopted the appellants' arguments, deeming the district court's September order controlling on the issue of reasonable efforts to that time, the appellants fail to justify further delays regarding the Interstate Compact process. Once SRS and the League received a response from the tribes, there was no attempt to initiate an Interstate Compact request to mitigate against the possibility that the placement with the Parsons aunt might fail. When the placement did fail to the extent that the Parsons aunt attempted suicide and D.C. was taken out of the Parsons aunt's home and placed in foster care, SRS and the League still did nothing with respect to the Interstate Compact process. A month after the League determined that D.C.'s reintegration with the Parsons aunt was no longer feasible, the agency finally forwarded the Interstate Compact request to Arizona.
*970 SRS and the League offered no reasonable explanation for this further delay. In fact, when social worker Dana Ison suggested using an expedited Interstate Compact process, the League's adoption supervisor discouraged the suggestion, indicating that a regular Interstate Compact process had been started, even though the request had not yet been forwarded to Arizona.
The result of these delays was to permit the foster parents to form an attachment to D.C., which encouraged them to seek adoption in December 2002. More importantly, the delay permitted D.C. to develop emotional bonds with her foster family that might not have occurred if D.C. had been able to be moved to Arizona more quickly. Under these circumstances, we cannot fault the district court's finding that SRS and the League failed to exercise reasonable efforts to ensure that the Arizona relatives' adoption application was adequately considered in a timely manner.

Diligence in Informing of the Placement Process
As previously mentioned, the League failed to inform the Arizona relatives of any existing right to a review of the decision to terminate the Interstate Compact process. When the League finally received responses from the tribes, the agency failed to notify the Arizona relatives. The League did not notify the Arizona relatives of the initial placement hearing on September 24, 2002. After the initial placement with the Parsons aunt failed, the League did not inform the Arizona relatives.
While SRS and the League are not solely responsible for maintaining contact with potential placement sources, the evidence in this case indicates the contact was heavily one-sided on the part of the Arizona relatives. Furthermore, the record reflects that the League contacted the Arizona relatives only grudgingly. During a case plan meeting following the Parsons aunt's placement disruption, the League's adoption supervisor is credited with stating, "KCSL will still have to go thru [sic] the motions with the Aunt in Arizona."
We conclude substantial evidence exists in the record to support the district court's finding that SRS and the League did not exercise *971 reasonable efforts to keep the Arizona relatives adequately informed of the adoptive placement process.

Inconsistent Application of Evaluation Criteria
The appellants contend the district court cannot appropriately reweigh the facts relied upon to support the agency's best interests analysis. We agree. However, reasonable efforts demand that an agency apply its policies and procedures, including the adoption placement evaluation criteria, consistently and fairly.
The district court's finding that SRS and the League effectively excluded the Arizona relatives from meaningful consideration for adoptive placement of D.C. is adequately supported by the record. Contrary to the arguments of the League, as amicus curiae in this case, the district court's determination does not challenge the policies and procedures adopted by SRS and the League to handle adoptive placements. Rather, the district court found the agencies failed to implement their policies and procedures equitably in an attempt to find the best possible placement for D.C. This is the purpose of the statutory "reasonable efforts" provision in K.S.A. 38-1584(d).

Court Ordered Placement
Finally, the appellants contend that, even if the district court properly found that SRS and the League failed to exercise reasonable efforts in finding an adoptive placement for D.C., the district court improperly exercised its authority in placing D.C. with the Arizona relatives.
"If the court determines that reasonable efforts or progress have not been made toward finding an adoptive placement or establishing an acceptable permanent guardianship or placement with a fit and willing relative, the court may rescind its orders and make other orders regarding custody and adoption that are appropriate under the circumstances." (Emphasis added.) K.S.A. 38-1584(d).
Based upon the plain meaning of the statute, a district court is authorized to rescind its prior orders and to enter new orders regarding custody or adoptive placement once the court has determined that the agency responsible for finding suitable placement has not exercised reasonable efforts or progress in doing so. See In *972 re J.D., 31 Kan. App. 2d at 665. The statute does not restrict the district court's power to fashion a suitable order for the placement of the child, and this court does not read into statutes that which is not readily found therein. See GT, Kansas, L.L.C. v. Riley County Register of Deeds, 271 Kan. 311, 316, 22 P.3d 600 (2001).
However, a district court's discretion in effecting a child custody or placement determination is subject to the child's best interests. The party challenging a district court's determination bears the burden of demonstrating that no reasonable person would take the position adopted by the district court. See In re J.A., 30 Kan. App. 2d at 423.
Although a district court must consider the totality of the circumstances in determining what is in the best interests of a child, this court has previously enumerated a nonexhaustive list of factors for considering a placement decision:
"1. The child's attachment to the parties;
"2. whether there has been any history of sexual, physical, emotional, or substance abuse on the part of any family member;
"3. age and health of the parties;
"4. whether the child would have siblings close to his age;
"5. motivation of the parties for wanting to adopt;
"6. potential permanence of the relationship between the child and adopting parents;
"7. emotional needs of the child;
"8. parenting skills, strength, and weaknesses; and
"9. special needs of the child." In re J.A., 30 Kan. App. 2d at 425-26.
The district court clearly considered each of the factors and indicated the court's assessment of each factor as it pertained to the case. Ultimately, the district court found that the Arizona relatives and the foster parents would provide equally appropriate placements for D.C. and applied the relative preference to determine that D.C. should be placed with the Arizona relatives.
The district court did not abuse its discretion in determining the parties were equally appropriate placements, except that, in considering D.C.'s emotional attachments, the district court acknowledged a bond between the child and her foster family but discounted this factor as being unfair to the Arizona relatives who were never provided an opportunity to create such a bond with *973 D.C. This analysis improperly directs the focus of inquiry upon the potential adoptive parents rather than upon the physical, mental, and emotional needs of the child.
In determining what is within the best interests of a child, the district court's only concern should be the physical, mental, and emotional needs of the child and how a potential adoptive resource may address those needs. See In re A.F., 13 Kan. App. 2d 232, 235, 767 P.2d 846 (1989) ("Between two competing custodial parties with equal interests, the question of unfitness is not the standard; rather, the standard is the best interests of the child.").
Because the district court discounted the acknowledged emotional bond D.C. shared with the foster parents, the case must be remanded for another best interests analysis. This is not to imply that simply because an emotional bond exists between D.C. and the foster parents, it is in D.C.'s best interests to be placed with the foster parents. The list of factors articulated in In re J.A. are not exclusive. However, the district court may not discount a potential factor indicating a placement in the best interests of D.C. because of considerations outside of the child's best interests.
Affirmed in part, reversed in part, and remanded for further proceedings.