No. 126,025

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of X.L.,
a Minor Child.

SYLLABUS BY THE COURT

1.

In cases arising under the Revised Kansas Code for Care of Children, the legislature has authorized appellate jurisdiction over only five types of decisions: those involving temporary custody, adjudication, disposition, findings of unfitness, and the termination of parental rights. An order terminating parental rights is the last appealable order in a child-welfare case. A finding of a lack of reasonable efforts to place a child for adoption issued after an order terminating parental rights is not subject to direct appellate review.

2.

By not providing for appeals of post-termination decisions, the legislature has underscored the parties' responsibility to work toward the child's recognizable need for permanency, instead of struggling back and forth among themselves at every stage in post-termination proceedings.

3.

The reviewability of an issue on appeal generally encompasses considerations of notice, preservation, and timeliness. Appellate jurisdiction defines appellate courts' power to consider an appeal at all.

1

4.

Before a party may argue a question of subject-matter jurisdiction on appeal, there must be a procedural mechanism for posing that question to the appellate court. In other words, there must be some vehicle through which the party can present the jurisdictional question to the appellate court.

Appeal from Wyandotte District Court; JANE A. WILSON, judge. Oral argument held August 15, 2023. Opinion filed December 22, 2023. Appeal dismissed.

*Marc Altenbernt* and *Melanie D. Caro*, Kansas Department for Children and Families, for appellant.

*Kate Zigtema*, of Zigtema Law Office LC, of Shawnee, and *Rae A. Nicholson*, of Rae Nicholson Law, LLC, of Overland Park, for appellees.

Before WARNER, P.J., GARDNER and HURST, JJ.

WARNER, J.: Appellate courts review the decisions of district courts and agency tribunals to ensure those decisions are consistent with the governing law and supported by the evidence presented. But not all decisions are subject to appellate review. Rather, the contours and extent of the right to appeal—including appellate courts' power to review certain decisions at all—are defined by the legislature.

One example of our limited appellate jurisdiction arises under the Revised Kansas Code for Care of Children, K.S.A. 38-2201 et seq. In cases where children have been removed from their parents' homes and placed in State custody, the legislature has determined that finality and permanency for children in need of care should be prioritized over the right to unfettered appellate review. Our legislature has thus statutorily limited litigants' ability to appeal child-welfare cases to only five kinds of decisions, ending with the termination of parental rights. There is no right to appeal rulings after termination.

2

The case before us illustrates this limitation. X.L. lived with a foster family for the first three years of her life, while her siblings were in other foster placements. After the district court terminated her biological parents' rights, the Department for Children and Families planned to place X.L. and her siblings together with a family that wanted to adopt all of them. X.L.'s foster parents—who wanted to adopt only X.L.—were unsuccessful in challenging the Department's placement plan in court and turned to other avenues to advance their interests, including the media and the legislature. These efforts eventually led Department Secretary Laura Howard to personally direct that X.L. should be adopted by the foster parents. The previously planned adoptive parents then moved for a finding that this abrupt shift was not the result of reasonable efforts by the Department to achieve permanency for X.L. because it made the decision with limited information and circumvented its own policies. The district court granted the adoptive parents' motion and placed X.L. with her siblings.

The Department appeals that post-termination decision. Likely recognizing there is no right to appeal this type of ruling, the Department creatively frames its question for review as involving a different kind of judicial power—namely, did the district court have subject-matter jurisdiction to consider the adoptive parents' motion? But regardless of whether this question is framed as one involving the district court's authority or the soundness of its ruling, the challenged ruling is a post-termination decision. We do not have the appellate jurisdiction to review that decision. Thus, we dismiss the appeal.

FACTUAL AND PROCEDURAL BACKGROUND

The child at the center of this case, X.L., is the youngest of several siblings. When X.L. was born in 2019, her brothers and sisters had already been adjudicated children in need of care and were the subjects of ongoing cases regarding their welfare. The district

3

court placed X.L. into the custody of the Department for Children and Families three days after her birth, and the Department immediately placed her with a foster family.

The district court terminated the parental rights of X.L.'s biological parents in January 2021. The court ruled that X.L. would remain in the Department's custody under K.S.A. 38-2270(a)(1) following that termination until a permanent placement could be made. In the meantime, X.L. remained with the same foster family she had lived with since her birth. Her three youngest siblings lived with a different foster family; her oldest siblings were aging out of the foster-care system.

*The Department seeks a family to adopt the four youngest children together*

Though X.L. had never lived with her siblings, they had visited each other regularly since shortly after termination. X.L., who was under two years old in January 2021, was too young to recognize her siblings for the first several months of visits. But by mid-2022, X.L. saw six of her older siblings at least twice per month and began developing closer relationships with them.

As the children's cases progressed toward permanency plans, the caseworkers at the Department and at Cornerstones of Care—an agency contracted to oversee X.L.'s case—believed it was in X.L.'s best interests to strengthen these relationships and ultimately live with her three youngest siblings. This belief was consistent with Department procedures that generally prioritized placing siblings together when possible. But neither X.L.'s foster parents nor the other children's foster placement could adopt all four siblings together. So the caseworkers continued to look for a family that could.

X.L.'s foster parents were unhappy with the Department's plan to find one adoptive family for all four children; they had raised X.L. since birth and wanted to adopt her alone. Thus, in April 2022, X.L.'s foster parents filed a motion claiming the

4

Department had not made reasonable efforts to find a permanent placement for X.L., seeking to immediately adopt her. The Department and caseworkers opposed this motion, detailing everything that had been done to find a family that could adopt X.L. and her three siblings together.

The district court held an evidentiary hearing in early August 2022 and denied the foster parents' motion later that month. The court explained that the caseworkers should continue to explore options that would keep X.L. with her siblings.

*The foster parents' efforts to adopt X.L. and the Secretary's change in position*

That month, the caseworkers found a family in another part of the state that was willing and able to adopt the four children. Caseworkers held a meeting to discuss the case and officially selected that family to adopt X.L. and her siblings. They then began the transition process, which included visits with the adoptive family. X.L. was "very excited" about the transition and—now almost three years old—had developed closer relationships with her siblings.

X.L.'s foster parents opposed this placement. After the district court denied their motion to adopt X.L., they engaged in various efforts outside the legal process to persuade the Department to change its position. The foster parents spoke with the news media, and stories about the case began to appear. They also approached the Kansas Legislature, which later held a closed legislative session about the issue. And the foster parents, along with others, directly contacted the planned adoptive parents (who for ease of reference we merely call "the adoptive parents"), pleading with them not to adopt X.L.

In October 2022, Department Secretary Laura Howard—who learned about the case through the media coverage—intervened in X.L.'s case and directed the Department to place X.L. with the foster parents for adoption. This was the first time in the

Secretary's four-year tenure that she had personally directed the outcome of an adoption case. She based her decision on portions of X.L.'s file but did not otherwise consult caseworkers, the guardian ad litem, X.L.'s siblings, the foster parents, or the adoptive parents.

*The motion that is the subject of this appeal*

About a week after the Secretary's decision, the adoptive parents requested the district court to find that the Department's sudden change in position did not result from reasonable efforts and to order that X.L. be placed directly with them for adoption. They argued that the Secretary's abrupt decision to permanently place X.L. with her foster parents was inconsistent with various internal procedures and the previous case plan.

The district court stayed its previous order authorizing the Department to consent to X.L.'s adoption pending a hearing and decision on the motion. The court also granted the foster parents interested-party status. But it admonished them for sharing confidential information about X.L. and her case with the media, barring them from attending or participating in upcoming proceedings.

In January 2023, the district court held a hearing on the adoptive parents' motion. All involved recognized that this was a difficult case. A therapist and X.L.'s most recent guardian ad litem had previously indicated that they believed X.L. should be placed with her foster parents, though neither testified. Several others disagreed. The court heard testimony from the siblings' case manager and the Department's foster-care liaison assigned to the case; both thought it would be best for X.L. to live with her siblings. The caseworkers also explained that many Department policies had been circumvented by the Secretary's decision—for example, there was no sibling-split staffing meeting or proper best-interests staffing waiver before the placement decision was made. In fact, the case

6

manager had refused to sign the sibling-split request because she was concerned by the Department's abrupt change in position.

In addition, the court heard testimony from one of X.L.'s older sisters, who would soon age out of foster care. The sister testified that she was concerned that she might not be able to see X.L. again if the foster parents adopted her, based on the sister's past experiences with X.L.'s foster parents. In contrast, the family that had planned to adopt X.L. and her three siblings had developed a relationship with the older sister, organized visits with her, and encouraged her to move nearby.

The Secretary also testified. She admitted that her decision was unusual and based on limited information. But she explained that she strayed from Department policies— including generally keeping siblings together—because X.L.'s case was an "extreme circumstance" that warranted a sibling split.

A few weeks after the hearing, the district court granted the adoptive parents' motion and ordered that X.L. be placed with them for adoption, along with her siblings. The court found that it was in X.L.'s best interests to be with her siblings, and it concluded that the Secretary acted against those interests by making a unilateral decision under media pressure. The court also found the Department's decision to place X.L. with her foster parents instead of with her siblings was not the result of reasonable placement efforts. The court explained that the Secretary's decision had circumvented internal policies and procedures, including splitting siblings without a staffing meeting, and had been made without consulting anyone directly involved in the case. And despite the Secretary's belief otherwise, this case was unfortunately not an extreme circumstance; foster parents often care for children from birth, and have close bonds with them, before they are adopted by someone else. The Department—not the foster parents—now appeals this decision.

DISCUSSION

The procedural posture of this case, coupled with the nature of the parties' arguments on appeal, have created quite the quagmire. From a procedural standpoint, we note that it is unusual for the Department to challenge a district court's ruling regarding the adoptive placement of a child, particularly when that placement was one the Department had, until relatively recently in the case, already been working toward. It is also unusual for the Department to advocate for placement with parties who have chosen, for whatever reason, not to participate in the appeal. But no one contests the Department's right as an interested party to participate in these proceedings. And there is no rule compelling the foster parents' continued participation—particularly when their participation had been previously limited by district court.

The Department's arguments on appeal are also somewhat confounding. The Department's brief makes clear it believes the district court erred when it found that the Department had not engaged in reasonable efforts or made reasonable progress toward a permanent placement for X.L. But it purports to not directly challenge the substance of that decision. Instead, the Department argues that the district court lacked subject-matter jurisdiction to rule on the adoptive parents' motion at all. The Department asserts that we should reverse the district court's decision and remand the case so the Secretary's plan of placing X.L. with her former foster parents may move forward.

The adoptive parents counter that we lack appellate jurisdiction to consider this appeal, which involves a decision rendered about two years after the parental rights of X.L.'s biological parents were terminated. They also assert that, even if we could consider the Department's claim, the district court had authority to act and did so properly.

So despite all that has happened leading up to this point, this appeal presents only two questions for our consideration, examining the jurisdiction of two different courts to

8

hear the parties' claims: Does this court have jurisdiction to review a direct appeal of the district court's post-termination decision? And if so, did the district court have jurisdiction to make that decision? We answer the first question "no"—we do not have authority to review the district's court ruling—and thus do not reach the second question.

1. *Post-termination decisions, the fifth and last phase of a child-welfare case, seek to find a permanent placement that is in the child's best interests.*

The contours of our jurisdiction in this case are guided by the procedural framework in the Kansas child-welfare statutes. We review this unique structure before considering the parties' arguments.

The Revised Kansas Code for Care of Children, K.S.A. 38-2201 et seq., is "a legislatively designated framework of sequential steps of judicial proceedings with each step occurring in a specific order leading toward permanency in the child's placement." *In re N.A.C.*, 299 Kan. 1100, Syl. ¶ 5, 329 P.3d 458 (2014). This framework, consisting of five phases, unfolds "in a specific, temporal order." *In re N.E.*, 316 Kan. 391, 393, 516 P.3d 586 (2022).

- First, when an acute need arises, putting a child in jeopardy, a district court must decide who will have temporary custody of the child. The court must determine "whether it should temporarily place the child in the custody of specific persons or entities listed by statute, such as the Secretary of [the Department]." 316 Kan. at 393; see K.S.A. 38-2243(f), (g)(1).

- Second, the case enters the "adjudication phase," where the district court adjudicates "whether the child meets one or more statutory definitions of a 'child in need of care.'" 316 Kan. at 393; see K.S.A. 38-2251; see also K.S.A. 38-2202(d)(1)-(14) (defining what it means to be a child in need of care).

- Third, if the child has been adjudicated to be in need of care, the case turns to the "dispositional phase," where the court decides who should have custody of the child as the case continues and also enters orders regarding plans on how the child's needs should be addressed—like possible reintegration with the child's parents. 316 Kan. at 393; see K.S.A. 38-2253(a).

- Fourth, if a party has alleged that reintegration is no longer a feasible option, the case enters the "termination phase." 316 Kan. at 393. At this point, the court must determine whether the parents are fit to care for the child and, if not, whether this unfitness will continue for the foreseeable future. K.S.A. 38-2269(a)-(c). The court must also decide whether terminating parental rights would be in the child's best interests. K.S.A. 38-2269(g)(1).

- Fifth, if parental rights have been terminated, the case enters the "post-termination phase." 316 Kan. at 394. The court enters orders that "facilitate[] placement of the child in a permanent family setting, whether through adoption or the appointment of a permanent custodian." 316 Kan. at 394; see K.S.A. 38-2269(g)(2). A district court's jurisdiction over a child-welfare case continues until the child turns 18, gets discharged from the case, or gets adopted. K.S.A. 38-2203(c).

If a district court has terminated parental rights to a child, the court must determine who will care for the child as the court and caseworkers seek a permanent placement solution. The court may immediately grant custody of the child to proposed adoptive parents, or it may grant custody to the Department Secretary. K.S.A. 38-2270(a). In making this decision, the court must consider the child's best interests. K.S.A. 38-2270(b). If the court grants custody to the Department, then the Secretary "shall have authority to place the child in a family home"—such as a foster home—and to "give consent for the legal adoption of the child." K.S.A. 38-2270(a)(1). And because parental

rights have already been terminated, meaning the child does not have a legal parent to consent to an adoption, the Secretary's consent is "the only consent required to authorize the entry of an order or decree of adoption." K.S.A. 38-2270(a)(1).

We note, as an aside, that when the Department has post-termination custody of a child, its consent is the only consent necessary to *authorize* an adoption, but not the only step needed to *finalize* it. That is, the Department's consent is necessary, but not sufficient, for the child to be adopted. An adoption is not final until the court approves the placement and enters an adoption decree. See K.S.A. 2022 Supp. 59-2134(a) ("If the adoption is granted, the court shall enter a final decree of adoption."); see also K.S.A. 38-2270(c) ("When an adoption decree has been filed with the court in the child in need of care case, the secretary's custody shall cease, the court's jurisdiction over the child shall cease and the court shall enter an order to that effect."); *In re T.S.W.*, 294 Kan. 423, 432-34, 276 P.3d 133 (2012).

The district court's jurisdiction during the post-termination phase continues "until an adoption or appointment of a permanent custodian has been accomplished." K.S.A. 38-2264(j); see also K.S.A. 38-2270(c) (Department's custody and court's jurisdiction cease upon filing of adoption decree). While some older decisions have referred to the court's role as "supervisory" during the post-termination phase, this description merely distinguished the court's actions there from the evidentiary termination hearing. See *In re A.F.*, 38 Kan. App. 2d 742, 743, 172 P.3d 63 (2007); *In re J.D.*, 31 Kan. App. 2d 658, 664, 70 P.3d 700 (2003). A district court may modify its post-termination orders as the needs in the case adjust. Most notably, if the court finds that "efforts or progress have not been made toward finding an adoptive placement" as the case progresses, the court has the authority to "rescind its prior orders and make others regarding custody and adoption that are appropriate under the circumstances." K.S.A. 38-2264(j).

11

Together, this statutory framework lays out a clear process in post-termination proceedings—a process aimed at finding the best permanent placement for the child as expeditiously as possible under the circumstances. The focus throughout the post-termination phase is on what is best for the child. Indeed, consideration of the child's best interests permeates the case, from the court's initial temporary-custody ruling through its post-termination orders. See, e.g., K.S.A. 38-2201(b)(1), (3) (directing courts to "make the ongoing physical, mental and emotional needs of the child decisive considerations in proceedings under this code"); K.S.A. 38-2270(b) (noting preferences for post-termination placement "to the extent that the court finds [those preferences to be] in the best interests of the child"); see also *In re D.C.*, 32 Kan. App. 2d 962, 966, 92 P.3d 1138 (2004) (holding that "a reasonable permanent placement decision necessarily implies a decision that is in the best interests of the child under the circumstances").

In one final stop on this procedural sojourn, we note that the five phases in child-welfares cases, though sequential, are not of equal duration. The temporary-custody and adjudication phases are designed to be short, allowing the child's immediate needs to be addressed. The dispositional phase may last longer—months or even over a year—as the court assesses whether the parents will be able to make changes that would allow them to care for the child. The termination phase is a targeted endeavor, allowing the parties to present evidence and testimony. The post-termination phase can be narrowly focused if an adoptive family or permanent custodian is already known, or it may last longer if decisions relating to the child's placement are more complicated.

This case illustrates such a complication. The district court entered an order terminating parental rights in January 2021. It rendered the post-termination ruling now on appeal about two years later. With the Department's appeal, that phase has now extended an additional year. We now turn to the jurisdictional arguments the parties have presented in that appeal.

12

2. *Kansas appellate courts do not have jurisdiction over appeals from a district court's post-termination decisions.*

The Department argues that the district court did not have subject-matter jurisdiction to consider the adoptive parents' motion under K.S.A. 38-2264(j) (alleging the Department had not engaged in reasonable efforts to find a permanent placement for X.L.). In its brief, the Department attacks the district court's ruling from several angles: It asserts the court lacked any ability to disagree with the Secretary's placement decision once it was made; it asserts there was not evidence before the district court to support its decision, as the adoptive parents challenged the Secretary's action less than two weeks after it was announced; and it asserts that the district court should not have considered X.L.'s interests in assessing whether the Department's change in position was reasonable. We note that most of these arguments concern whether the district court's decision was correct, not whether the court had the ability to enter that decision in the first place. The adoptive parents argue, however, that we need not—in fact, cannot—consider these points further because we do not have appellate jurisdiction to review a district court's post-termination decision. We agree.

"The right to appeal derives from statute." *State v. Clark*, 313 Kan. 556, Syl. ¶ 1, 486 P.3d 591 (2021). This means that appellate courts may exercise jurisdiction only when a statute authorizes it. 313 Kan. 556, Syl. ¶ 1.

In cases arising under the Revised Kansas Code for Care of Children, the legislature has authorized appellate jurisdiction over only five types of decisions: those involving "temporary custody, adjudication, disposition, finding of unfitness[, and the] termination of parental rights." K.S.A. 38-2273(a). This limited class of appealable orders reflects the timeline of child-welfare cases; each order "occurs in a sequence leading to permanent placement for the child in need of care." *In re N.A.C.*, 299 Kan. at 1116. An order terminating parental rights is "the last appealable order" in these cases. 299 Kan. at

13

1118. Any order after that—including a finding of a lack of reasonable efforts to place a child for adoption—is not subject to appellate review. 299 Kan. at 1103-04, 1122; see *In re N.E.*, 316 Kan. at 404 (reaffirming this conclusion).

While the legislature has limited some appellate review, it did so to balance the many interests at play in child-welfare cases, ensuring "timely closure" for the children involved. *In re N.A.C.*, 299 Kan. at 1121. Allowing post-termination appeals "could leave children exposed to an endless circle of appellate custody battles." 299 Kan. at 1120. By not providing for direct appeals of post-termination decisions, the legislature has underscored the parties' responsibility to work toward "the child's recognizable need for permanency," instead of "struggl[ing] back and forth among themselves at every stage in post-termination proceedings." 299 Kan. at 1121.

Based on these principles, the parties here agree that the substance of the district court's post-termination ruling is beyond our review. That is, we do not have appellate jurisdiction to consider the district court's reasoning as to whether the Department's abrupt change of position constituted reasonable efforts to find a permanent placement for X.L. and her siblings.

The Department seeks to distinguish its jurisdictional claims from the merits of the district court's decision, however. It asserts that we *may* consider its claim that the district court lacked subject-matter jurisdiction to enter those rulings in the first place. After all, the Department claims, appellate courts may always consider whether subject-matter jurisdiction exists in a case. *Williams v. Lawton*, 288 Kan. 768, 779, 207 P.3d 1027 (2009). Indeed, we have a duty to consider that question, even when the parties do not raise it. *Kaelter v. Sokol*, 301 Kan. 247, Syl. ¶ 1, 340 P.3d 1210 (2015). And if a district court lacked jurisdiction to render a judgment, its judgment is void. *In re Adoption of A.A.T.*, 287 Kan. 590, Syl. ¶ 2, 196 P.3d 1180 (2008). Thus, the Department argues the

district court exceeded its statutory authority in how it handled the reasonable-efforts motion, rendering its decision void.

We are not persuaded by the Department's attempt to forge a new appellate path for at least two reasons. *First*, as we have noted, despite the Department's efforts to frame these questions as jurisdictional, it attacks both the ultimate result of the district court's ruling and the way it was reached—claims that do not implicate jurisdiction. There is a difference between misapplying or misconstruing statutes (the allegations underlying most of the Department's claims) and lacking all authority to hear a case. See *In re Estate of Wolf*, 32 Kan. App. 2d 1247, 1251, 96 P.3d 1110 (2004) ("The question before us is whether the trial court exceeded its statutory authority, not whether the trial court lacked subject matter jurisdiction."), *aff'd* 279 Kan. 718, 112 P.3d 94 (2005). Deciding something incorrectly is different from lacking jurisdiction to decide it at all.

A district court's jurisdiction over a child-welfare case continues until the child turns 18, gets discharged from the case, or gets adopted. K.S.A. 38-2203(c). An adoption is not final until the court enters an adoption decree. See K.S.A. 2022 Supp. 59-2134(a) ("If the adoption is granted, the court shall enter a final decree of adoption."); see also *In re T.S.W.*, 294 Kan. at 432-34. When the district court here ruled on the adoptive parents' reasonable-efforts motion, X.L. had not turned 18, been discharged, or been adopted. No court had entered an adoption decree. Thus, the district court retained jurisdiction over the case.

*Second*, and more important from a procedural standpoint, the mere fact that a party may review a district court's subject-matter jurisdiction at any time, including for the first time on appeal, does not automatically confer appellate jurisdiction to hear that claim. The reviewability of a specific issue on appeal—including an issue relating to subject-matter jurisdiction—generally encompasses considerations of notice,

preservation, and timeliness. Appellate jurisdiction defines our power to consider an appeal *at all*, regardless of the issues raised.

Before a party may argue a question of subject-matter jurisdiction on appeal, there must be a procedural mechanism for posing that question to the appellate court. Accord *State v. Trotter*, 296 Kan. 898, 905, 295 P.3d 1039 (2013) (holding that a person could not use a K.S.A. 60-1507 motion to present subject-matter jurisdiction argument for the first time on appeal when he was procedurally barred from bringing that motion in the first place). In other words, there must be some vehicle through which the party can present the jurisdictional question to the appellate court.

Here, the Department has attempted to bring its jurisdictional claim in an appeal from a post-termination decision. But post-termination decisions in child-welfare cases— including a lack-of-reasonable-efforts finding—are not appealable in this manner. See *In re N.A.C.*, 299 Kan. at 1121-22. Thus, the vehicle the Department has chosen is flawed; regardless of the issues raised, we do not have appellate jurisdiction over the case before us. The appeal must be dismissed.

We pause before concluding to provide a closing observation and address one remaining loose end. *The observation*: While the absence of an appeal in these instances may seem harsh, the Kansas Supreme Court has recognized and grappled with this reality, noting that "district court judges who are tasked with presiding over these difficult [child-welfare] cases are well aware of the stakes." 299 Kan. at 1122. And the lack of a statutory right to appeal does not leave interested parties without any recourse if an extraordinary situation warrants intervention by the appellate courts. When Kansas law does not provide a remedy by appeal, a party can seek a writ of mandamus if it believes the district court has exceeded its authority. See *Kansas Medical Mut. Ins. Co. v. Svaty*, 291 Kan. 597, Syl. ¶ 11, 244 P.3d 642 (2010). Here, the Department did not file a request for a writ of mandamus to address the district court's post-termination ruling.

*The loose end*: Following oral argument in this case, the adoptive parents filed a motion seeking costs and attorney fees incurred during the course of this appeal. They assert that the Department's efforts to bring this appeal when the Kansas Supreme Court has held in *In re N.A.C.* and *In re N.E.* that there is no appellate jurisdiction to consider post-termination motions rendered its appeal frivolous. We question the assertion that because post-termination appeals have previously been rejected by the Kansas Supreme Court, the Department's appeal here was frivolous on its face. But our discussion need go no further. Because we lack appellate jurisdiction to consider the case before us, we similarly lack appellate jurisdiction to consider a request for appellate costs and attorney fees. See *Kaelter*, 301 Kan. at 250. We therefore deny the adoptive parents' motion for costs and attorney fees.

In limiting appeals in child-welfare cases, the legislature struck a balance. To ensure finality for the children involved, it did not provide for appeals of post-termination decisions. This court thus lacks jurisdiction to review the district court's post-termination decision finding that the Department lacked reasonable efforts and the court's placement of X.L. with her siblings.

Appeal dismissed.