(111 P.3d 651)
No. 91,997

IN THE MATTER OF THE ADOPTION OF B.G.J.

Opinion filed May 13, 2005.

*Margie J. Phelps,* of Topeka, and *Rachel I. Hockenbarger,* of Phelps-Chartered, of Topeka, for appellant Prairie Band Potawatomi Nation.

*Martin W. Bauer* and *Teresa L. Mah,* of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, and *Michael J. Belfonte,* of Michael J. Belfonte, P.C., of Kansas City, Missouri, for appellees adoptive parents.

Before HILL, P.J., MARQUARDT and JOHNSON, JJ.

HILL, J.: In this case we are asked to decide if the district court had sufficient cause to deviate from the adoption placement preferences established in the Indian Child Welfare Act, 25 U.S.C. § 1901 *et seq.* (2000). While it is true that the Act establishes adoption preferences, if there is good cause, courts do not have to follow them. Relying primarily upon the relinquishing mother's strong rejection of her extended Indian family and her equally strong preference for the adopting parents, the trial court overruled the objections of the Prairie Band Potawatomi Nation (Tribe) and granted the adoption of B.G.J. to a non-Indian couple from Edmond, Oklahoma. Employing an abuse of discretion standard, we hold that the trial court had good cause to not follow the preferences set out in the Act and, accordingly, affirm.

*Background Facts*

B.G.J. was born on June 4, 2003, in Topeka, Kansas. Her mother is T.J., who is half Native American, and her unknown father is African-American and has no known Indian heritage. T.J. and her other children are members of the Prairie Band Potawatomi Nation. B.G.J. is eligible for membership in the Tribe but has not yet been enrolled. Neither T.J. nor her children have ever lived on an Indian reservation. They have received some benefits from the Tribe, such as medical and dental care, child care, school grants, a computer, housing when needed, and financial help for utilities and food.

T.J. kept her pregnancy confidential. The day after B.G.J.'s birth, T.J. contacted Adoption of Babies and Children, Inc. to begin the adoption process. The adoption agency notified the Tribe of B.G.J.'s birth on June 5, 2003, by letter. In the letter, the agency

stated that although T.J. had already selected a family to adopt B.G.J., the agency would not place the child until it determined whether the Tribe wished to intervene. During the following several days, the Tribe informed the agency through telephone calls that there were no prospective adoptive families available at the time and there were only two foster care options and one of them was a group home. T.J. opposed the Tribe providing any foster care for B.G.J. Obeying her wishes, B.G.J. was placed by the adoption agency in private foster care pending T.J.'s selection of a prospective adoptive family.

T.J. selected R.F. and L.F. from Edmond, Oklahoma, to adopt B.G.J. from a selection of possible parents kept by the adoption agency. R.F. and L.F. had already completed home studies and were approved as prospective adopting parents. They are not Native American, but L.F. had worked with Native American communities in a research capacity. Additionally, L.F. had many Native American friends and colleagues.

*District Court Proceedings*

The adopting couple received physical custody of B.G.J. on June 24, 2003. The next day, T.J. relinquished custody of B.G.J. to the agency so R.F. and L.F. could adopt B.G.J. Subsequently, the parental rights of B.G.J.'s unknown birth father were terminated.

Later, on July 23, 2003, a member of the Tribe informed the adoption agency there was a family available within the Tribe to adopt B.G.J. According to this Tribe member, the family had been available "from the beginning"; this contradicted what the agency had previously been told. The agency stated that it never received information about this family.

The district court granted the Tribe's motion to intervene. The Tribe also filed a motion to transfer the case to the tribal court and to dismiss the state court proceedings. At the same trial, the district court heard the adoption petition as well as the Tribe's objection to the adoption. The two issues tried were the suitability of petitioners, R.F. and L.F., as adopting parents and whether petitioners could show good cause to deviate from the Indian Child Welfare Act's placement preferences. At the hearing, T.J. asked the court

not to transfer the case to the tribal court. Further, T.J. explained she was aware of the Indian Child Welfare Act's placement preferences but did not want B.G.J. to be raised by any member of her family or any Native American. Therefore, T.J. requested that the court deviate from the law's placement preferences and allow petitioners to adopt B.G.J.

The relinquishing parent, T.J., testified that she does not follow the culture and customs of the Tribe, nor does she practice the Drum Religion, the religion practiced by most of the Tribe. But she has participated in a tribal practice called a sweat lodge on a couple of occasions. T.J. testified she had considered but rejected a number of family members as potential adoptive parents for B.G.J. T.J. stated she had not wavered in her decision to relinquish B.G.J. and place her with the petitioners. T.J. believed it was in the best interest of B.G.J. to be adopted by R.F. and L.F. and stated unequivocally that if the court did not allow them to adopt B.G.J., she would take B.G.J. back and rear her outside the practices and customs of the Tribe.

Then, from the Tribe's point of view, a number of people willing to adopt B.G.J. testified. Among them was Robin Guerrero, T.J.'s niece and a member of the Tribe. Guerrero did not live on the reservation but was an employee of the Tribe and was willing to raise B.G.J. in the Tribe's heritage. Guerrero had neither undergone an assessment by a social worker to be approved as a potential adoptive parent, nor filed a petition to adopt B.G.J.

Yvonne Castro-Hoss, a cousin of T.J., testified she, too, was interested in adopting B.G.J. Neither Castro-Hoss nor her husband are Native American, but her husband works for the Tribe. Like Guerrero, Castro-Hoss did not file a petition for adoption and had not obtained an assessment by a social worker to be approved as a potential adoptive parent.

Roberta Guerrero, T.J.'s half sister and a member of the Tribe, testified she wished to adopt B.G.J. and raise her in the Tribe's heritage. Roberta Guerrero was 50 years old, single, and earned a monthly income of $600. Guerrero had neither obtained an assessment by a social worker to be approved as a potential adoptive parent, nor filed a petition to adopt B.G.J.

Finally, Jennifer Herrera, T.J.'s sister and a member of the Tribe, testified she would like to adopt B.G.J. Herrera was married and had eight children living in her home. Herrera followed some of the Tribe's rituals and was willing to raise B.G.J. in the Tribe's heritage. Herrera did not file a petition to adopt B.G.J. and had not obtained an assessment to be approved as a potential adoptive parent.

Given T.J.'s decision to keep her pregnancy confidential, neither Guerrero nor Herrera knew of T.J.'s pregnancy or B.G.J.'s birth until shortly before the hearing.

*District Court Ruling*

The district court stated that although T.J. was one-half Native American by blood, her lifestyle choices and practices were essentially that of a non-Native American. Nevertheless, the court determined the Indian Child Welfare Act applied to the placement of B.G.J. despite T.J.'s desire for B.G.J. to be reared in a non-Native American environment. Accordingly, the court decided a finding of good cause was required in order to deviate from the adoption placement preferences in the Indian Child Welfare Act.

The court ruled that the adopting parents, R.F. and L.F., as the parties urging a deviation from the preferences, had the burden to establish the existence of good cause for such deviation. The court decided they had satisfied their burden. In doing so, the court looked to guidelines issued by the Bureau of Indian Affairs (BIA), which formulates factors relevant to the determination of good cause, such as the request of the biological parents, the extraordinary needs (physical or emotional) of the child, and the unavailability of suitable families for adoptive placement following a diligent search. See 44 Fed. Reg. 67,594 (1979). Further, the court found the best interests of B.G.J. was a relevant but not controlling factor in determining whether good cause had been established.

After concluding there was good cause to deviate from the law's placement preferences, the court found petitioners were suitable to adopt B.G.J. The child had obviously bonded with them, and it was in B.G.J.'s best interest to be adopted by the couple. The court granted their petition for adoption.

*Issues on Appeal*

The Prairie Band Potawatomi Nation attacks the district court's decision in two ways. It claims errors of law and misinterpretation of the facts. The Tribe offers four legal arguments. It believes that the relinquishing mother's preferences should not negate the placement preferences contained in the Indian Child Welfare Act; that the court improperly shifted the burden from the adopting parents to the Tribe to show the Act's preferences should be followed; that the court failed to require the adopting parents to show they had made a diligent search for suitable Indian placement options and, instead, erroneously compelled the Tribe to do so; and, finally, that the court incorrectly applied the "best interest of the child" standard to the case. Next, the Tribe contends that the court simply erred in finding its placement options were unsuitable and that the evidence of B.G.J.'s bonding with the adopting parents could be considered by the court as evidence to overcome the placement preferences in the Indian Child Welfare Act.

Because the parties do not agree on the standard of review we should employ, we begin with that point. Then we will examine the Indian Child Welfare Act and analyze the case within its rules, dealing with the claimed legal issues first, followed by the fact interpretations.

*Standard of Review*

Our research reveals that Kansas appellate courts have not previously said what standard is to be applied when reviewing a district court's finding of good cause to deviate from the Indian Child Welfare Act's placement preferences. The Tribe claims the district court's decision should be reviewed de novo. The adopting parents argue that this court should review the district court's decision with an abuse of discretion standard, citing cases arising outside of this jurisdiction for support.

Indeed, other jurisdictions have applied an abuse of discretion standard of review to this issue. See, *e.g.*, *Matter of Adoption of F.H.*, 851 P.2d 1361, 1363 (Alaska 1993) (good cause determination within court's discretion and will be reversed only if court abused its discretion or if controlling factual findings clearly erroneous);

*Matter of Appeal in Maricopa County*, 136 Ariz. 528, 534, 667 P.2d 228 (Ct. App. 1983) (applying abuse of discretion standard when reviewing the district court's deviation from placement preferences); *Adoption of M*, 66 Wash. App. 475, 482, 832 P.2d 518 (1992) (good cause is a matter of discretion).

We think the use of the term "good cause," without further legislative definition was designed to provide state courts with some flexibility in determining the proper placement of Indian children. Good cause is a matter of discretion to be exercised in light of many factors, including but not necessarily limited to the best interest of the child, the wishes of the biological parents, the suitability of the persons referred for placement, the child's ties to the tribe, and the child's ability to make any cultural adjustments necessitated by a particular placement. *Adoption of M*, 66 Wash. App. at 482 n.5. Because flexibility implies discretion, we will employ an abuse of discretion standard of review.

Judicial discretion is abused only when no reasonable person would take the view adopted by the district court. *Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 44, 59 P.3d 1003 (2002).

## Indian Child Welfare Act Fundamentals

There is no doubt that the Indian Child Welfare Act applies to this case. Adoption placements are included in 25 U.S.C. § 1903(1)(iv) (2000) as a type of child custody proceeding within the purview of the law. See also *In re Adoption of Baby Boy L.*, 231 Kan. 199, 207, 643 P.2d 168 (1982) (Indian Child Welfare Act applies to child custody proceedings in Kansas involving an Indian child). 25 U.S.C. § 1903(4) defines "Indian child" as an unmarried person under age 18 who is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. B.G.J. satisfies those requirements.

The stated policy of the Indian Child Welfare Act is to establish federal criteria for the removal and placement of Indian children and to give assistance to the various Indian Nations in maintaining their culture and native identity and in their operation of family and child welfare programs:

"The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." 25 U.S.C. § 1902 (2000).

This policy has been clarified in guidelines adopted by the Bureau of Indian Affairs in the Department of the Interior in 44 Fed. Reg. 67,584 (1979):

"Congress through the Indian Child Welfare Act has expressed its clear preference for keeping Indian children with their families, deferring to tribal judgment on matters concerning the custody of tribal children, and placing Indian children who must be removed from their homes within their own families or Indian tribes. Proceedings in state courts involving the custody of Indian children shall follow strict procedures and meet stringent requirements to justify any result in an individual case contrary to these preferences." 44 Fed. Reg. 67,585-6 (1979).

That policy is clearly followed in the Act's three Indian child adoption placement preferences stated as the Indian family, the tribe, or other Indians:

"In any adoptive placement of an Indian child under State law, a preference shall be given, *in the absence of good cause to the contrary*, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." (Emphasis added.) 25 U.S.C. § 1915(a) (2000).

The Act does not define good cause, but the guidelines suggest three areas of concern that could qualify as good cause:

(1) the request of the biological parents or the child when the child is of sufficient age;

(2) the extraordinary physical or emotional needs of the child, as established by an expert witness; and

(3) the unavailability of suitable families for adoptive placement following a diligent search for families meeting the preference criteria. 44 Fed. Reg. 67,594, F.3 (1979).

*Analysis*

After correctly deciding that the Indian Child Welfare Act applied to this adoption, the district court ruled that the adopting

parents had the burden to establish good cause to not follow the Act's adoption preferences. The guidelines require this. "The burden of establishing the existence of good cause not to follow the order of preferences . . . shall be on the party urging that the preferences not be followed." 44 Fed. Reg. 67,594 F.3(b) (1979). The court then focused on two of the three areas of concerns set out in the guidelines as possible good cause, the mother's strong rejection of her family and tribe and the relative unsuitability of the four placement options presented by the Tribe.

*Mother's Strong Preference*

The court correctly noted that T.J. did not rear her other children to know and practice their Indian heritage and indicated that T.J.'s preference was clear: she wanted B.G.J. to be raised by petitioners and not by any family member or Native American. T.J. was adamantly opposed to the Tribe's two foster care options when preadoption placement was considered. Furthermore, she feels so strongly about this that should the adopting couple not be allowed to adopt B.G.J., T.J. has vowed to withdraw her voluntary relinquishment of rights and consent to adopt B.G.J. and raise B.G.J. outside of her Indian culture and without the teachings of the Tribe.

Both the Indian Child Welfare Act and the BIA Guidelines approve the desires of a relinquishing parent as a relevant factor in a good cause determination. 25 U.S.C. § 1915(c) stated: "Where appropriate, the preference of the Indian child or parent shall be considered: *Provided,* That where a consenting parent evidences a desire for anonymity, the court or agency shall give weight to such desire in applying the preferences." See 44 Fed. Reg. 67,594 F.3(a)(i) (1979).

The Tribe's arguments to the contrary are not convincing. Many of the learned articles mentioned in its brief focus on involuntary removal of Indian children. This is a voluntary proceeding. The Tribe eloquently attempts to persuade us that to allow a relinquishing mother's preference to control would thwart the fundamental policy and purpose of the Indian Child Welfare Act. But, nonetheless, Congress did give trial courts discretion and used a general

undefined term "good cause" so the courts could exercise that discretion where appropriate. The guidelines, while not controlling, are persuasive. They list a parent's request as the first consideration when deciding good cause.

Furthermore, we think it important to note that the Indian Child Welfare Act permits the withdrawal of adoption consent. Indeed, in voluntary proceedings for the termination of parental rights to or the adoptive placement of an Indian child, the Act allows a parent to withdraw his or her consent for any reason prior to the entry of a final decree of termination or adoption; in such a situation, the child shall be returned to the parent. 25 U.S.C. § 1913(c) (2000). Therefore, a determination by this court that the placement preferences of the Indian Child Welfare Act must be adhered to would not result in someone who satisfies those stated preferences raising B.G.J.; rather, such a determination would only result in T.J. regaining custody of B.G.J. whom she would rear essentially as a non-Native American.

Also, we note that the Indian Child Welfare Act has careful parental consent requirements. (All of these steps were followed in this case.) Consent to adopt, in order to be valid, can only be signed at least 10 days after the birth of the child and then only in front of a judge of competent jurisdiction who certifies that the parent fully understood the terms and consequences of signing the consent as told them either in English or as interpreted into a native language the parent understands. Even then, the parent can withdraw consent at any time prior to a final adoption order. Furthermore, even after the final order has been entered, the consenting parent can try to have it set aside upon showing evidence of fraud or duress. 25 U.S.C. §1913(a), (c), and (d). We think the inclusion of this provision in the Indian Child Welfare Act means that the preferences of the parent are of prime importance. The district court was correct when it attached great importance to T.J.'s strong preferences because that is what the Indian Child Welfare Act requires.

*Four Placement Options*

Regarding the suitability of the prospective Indian placements, the court found the evidence was neither clear nor convincing that

any of the four who testified were suitable for placement, especially given T.J.'s strong opposition and the absence of social assessments approving them as adoptive placements. The trial court stated:

"[T.J.] knew her extended family long before her seventh child, [B.G.J.], was born. When she decided she could not rear the Child, she knew the background and parenting skills of the members of her extended family and she was adamant not to allow them to have placement of the Child. Based on the testimony of those proposed for placement of the Child, the evidence was neither clear or convincing that Roberta Guerrero, Robin Guerrero, Jennifer Herrera or Yvonne Castro-Hoss were suitable to have placement of [B.G.J.]. Three of the four are tribal members of [the Tribe]. They do not live on the Tribe's reservation or regularly practice [the Tribe's] heritage. Their life-style and cultural practices appeared consistent with [T.J.'s]."

It appears the court decided that these four options provided no clear Indian alternatives as adoptive homes.

The Tribe challenges the district court's finding that the proffered placement options that satisfied the Act's placement preferences were unsuitable, particularly taking issue with the court's reliance on T.J.'s rejection of those placement options. Further, the Tribe contends the district court improperly placed the burden upon the Tribe, rather than petitioners, to make a diligent search for suitable placement options. For support, the Tribe cites the district court's statement that the Tribe failed to offer suitable placements for B.G.J.

The Tribe's characterization of the district court's actions as burden shifting, is erroneous. The court properly placed the burden upon petitioners to prove the existence of good cause to deviate from the Indian Child Welfare Act's placement preferences. Almost immediately following B.G.J.'s birth, petitioners, through the agency, made an inquiry to the Tribe regarding whether potential placements existed; the Tribe responded that no prospective adoptive families were available. T.J. was adamantly opposed to the Tribe's two foster care options. More than a month later, the Tribe informed the agency that it had a family available to adopt B.G.J., but the Tribe never provided information regarding this family to the agency. We find no incorrect shifting of the burden of proof

here. The adoption agency worked with the Tribe, but its efforts were unsuccessful.

At the hearing, the Tribe presented four individuals who wished to adopt B.G.J. These individuals had little prior knowledge of B.G.J. due to T.J.'s desire for confidentiality. Presumably, this explains the absence of social assessments regarding these potential placements. Nevertheless, T.J. remained steadfastly opposed to any of these placements. Further, the district court characterized these potential placements as not providing a distinctive Native American environment for B.G.J., which is the heart of the Act.

The district court's determination that suitable placement options satisfying the Act's preferences were unavailable is supported by the record. We think the court correctly followed the spirit of the Indian Child Welfare Act as well as the letter of the law. The court examined the evidence offered by the four placements in light of a possible Indian heritage for B.G.J. and found the four placements not significantly different than the relinquishing parent, T.J. Obviously, with a newborn infant there are no ties to the tribe that will be broken and no cultural changes to be made as mentioned in *Adoption of M.* We find no abuse of discretion here.

## Bonding With Adopting Parents

The trial court acknowledged the bond between B.G.J. and the adopting parents, with whom she has been living since shortly after her birth in 2003. The court considered that as evidence of what was in B.G.J.'s best interest. The court made clear, however, that the best interest consideration was only part of its good cause determination; it was not the controlling factor. We think similarly, that the court's consideration of the bond between B.G.J. and petitioners was appropriate. See *F.H.*, 851 P.2d at 1365 (strong bond between child and prospective adoptive parents was proper factor for district court to consider in making good cause determination). We find no error here.

## Existing Indian Family Doctrine Not Followed

The Tribe makes an extensive argument against the existing Indian family doctrine, which was first established in *In re Adoption*

*of Baby Boy L.*, 231 Kan. 199, and recently reiterated in *In re J.J.G.*, 32 Kan. App. 2d 448, 452-53, 83 P.3d 1264 (2004). In *Baby Boy L.*, our Supreme Court held that the purpose of the Indian Child Welfare Act "was not to dictate that an illegitimate infant who has never been a member of an Indian home or culture, and probably never would be, should be removed from its primary cultural heritage and placed in an Indian environment over the express objections of its non-Indian mother." 231 Kan. at 206.

But the Tribe acknowledges the district court did not use this doctrine to find the Act inapplicable to this case. Indeed, the court found the Indian Child Welfare Act applied but that good cause existed not to follow its placement preferences. Really, the Tribe simply urges this court to reject the doctrine. This we cannot do as this court is duty bound to follow Kansas Supreme Court precedent in the absence of some indication that the court is departing from its previous position. See *Pruter v. Larned State Hospital*, 28 Kan. App. 2d 302, 312, 16 P.3d 975 (2000), *aff'd* 271 Kan. 865, 26 P.3d 666 (2001). We decline the invitation to reject the doctrine because it was not used in this case.

Affirmed.