No. 104,424

In the Matter of T.S.W., a Minor.
(276 P.3d 133)

Opinion filed May 4, 2012.

*N. Cheryl Hamby*, assistant attorney general, of Tahlequah, Oklahoma, argued the cause, and *Anita Settle Kemp*, of Wichita, was with her on the briefs for appellant/intervenor Cherokee Nation.

*Richard A. Macias*, of Wichita, argued the cause and was on the brief for appellee/Adoption Centre of Kansas, Inc.

The opinion of the court was delivered by

MORITZ, J.: Cherokee Nation, Intervenor, challenges the district court's decision under the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1901 *et seq.* (2001), to deviate from ICWA's placement preferences, see 21 U.S.C. § 1915(a) (2001), based upon the bio-

logical non-Indian mother's preference that her child be placed with a non-Indian family. Because we conclude that absent a request for anonymity by a biological parent, a parent's placement preference cannot override ICWA's placement factors, we reverse the district court's determination.

## FACTUAL AND PROCEDURAL BACKGROUND

D.R.W. (Mother) gave birth to T.S.W. on September 14, 2009. Approximately 2 months before T.S.W.'s birth, Mother decided to place her child for adoption. She contacted Adoption Centre of Kansas, Inc. (the Agency) to assist her in that process, and she identified two possible fathers of her child, one of whom was J.A.L.

In early August 2009, J.A.L.'s mother notified the Agency that J.A.L. was a member of Cherokee Nation (the Tribe). Because of the child's potential eligibility for membership in the Tribe, the Agency requested that the Tribe provide profiles of potential adoptive families.

In early September, employees of the Agency exchanged several e-mails with employees of the Tribe. In these e-mails, the Agency advised that because the Tribe had no families that could pay the Agency's $27,500 flat fee, the Agency wished to place Mother's child with one of its own families. However, the Agency expressed concern that the Tribe might seek to remove the child at a later time. The Agency also pointed out that Mother had her own criteria for any adoptive family, including that the couple be Caucasian, childless, financially secure, and open to postadoption visitation.

The Tribe responded that it had identified several certified families that could meet Mother's adoption criteria but that it had no families capable of paying the Agency's $27,500 fee. The Tribe also pointed out that "[a]gency fees are not a reason to deviate from federal law."

Eventually, on September 9, 2009, the Agency's counsel, through an e-mail sent by an Agency employee, advised the Tribe that Mother would consider family profiles that met Mother's "criteria" and the Agency would "base fees and cost on an appropriate sliding scale." However, the Agency's counsel noted that the

Agency's fees and costs could not be calculated absent information as to the prospective adoptive family's overall financial condition. The following day, September 10, 2009, the Tribe sent profiles of two potential adoptive families to the Agency.

Mother gave birth to T.S.W. on September 14, 2009. On September 15, 2009, the Agency filed a petition in district court seeking to terminate the parental rights of the two potential biological fathers. The petition specifically noted: "Subsequent to this petition for termination of parental rights, a petition for the adoption of the subject minor child will be filed."

After court-ordered paternity testing conclusively determined that J.A.L. (Father) was T.S.W.'s biological father, the Agency filed an amended petition on October 1, 2009, seeking termination of Father's parental rights. Also on October 1, 2009, the court granted temporary custody of T.S.W. to the Agency.

Father filed a handwritten objection to the petition, noting that although he was in jail, his mother was willing to raise T.S.W. However, the Agency did not contact any of Father's family members regarding T.S.W.'s placement because Mother did not want T.S.W. to be placed with Father's family.

Meanwhile, the Agency had not communicated with the Tribe regarding the Indian family profiles provided by the Tribe. Consequently, on September 28, 2009, the Tribe requested an update from the Agency on T.S.W.'s placement. On September 30, 2009, the Agency responded that T.S.W. had been born on September 14, 2009; that paternity testing had confirmed that J.A.L. was T.S.W.'s biological father; that J.A.L. planned to contest the adoption; and that Mother had selected one of the two families provided by the Tribe as a possible adoptive family for T.S.W.

Based on T.S.W.'s status as an Indian child, on October 21, 2009, the Tribe moved to intervene in the action to terminate Father's parental rights. The record on appeal contains no ruling on this motion. Nevertheless, on November 5, 2009, the Tribe filed both an answer to the Agency's amended petition to terminate parental rights and a counter-petition requesting application of ICWA to the proceedings.

By November 2, 2009, both of the families proposed by the Tribe had withdrawn from consideration as potential adoptive families for T.S.W. The record reflects somewhat conflicting testimony regarding the reason for their withdrawal. According to testimony of the Tribe employees, one of the families withdrew because it received another placement while the other family withdrew because of concerns about the Agency's fees as well as the cost of potential litigation with Father.

In any event, upon learning of the unavailability of these families, the Agency requested that the Tribe provide profiles of other available adoptive families. But before the Tribe could do so, the Agency reviewed with Mother the profiles of several of its own families. From these profiles, Mother chose a non-Indian family to adopt T.S.W.

Apparently unaware that Mother had selected a non-Indian family, on November 9, 2009, the Tribe provided the Agency with an additional 17 to 20 Indian family profiles. Mother reviewed those profiles, but according to an Agency employee, Mother did not prefer any of the Indian families over the non-Indian family she had already selected. Mother later testified that had she not been permitted to place T.S.W. with the family of her choice, she would have withdrawn her consent to T.S.W.'s adoption.

Meanwhile, on November 18, 2009, the Agency filed a pleading entitled "Petition" seeking to deviate from ICWA's placement preferences in the pending action to terminate Father's parental rights. Although to this point no adoption proceeding had been filed, the Agency recited that it sought to deviate from ICWA's placement preferences. The pleading did not indicate whether the Agency sought to deviate from ICWA's temporary or adoptive placement preferences, nor did it indicate whether an adoption petition had been filed or was forthcoming. Further, although the "petition" mentioned ICWA, it contained no statutory reference to the Act, nor did it identify or discuss ICWA's placement preferences.

The docket sheet indicates the district court conducted a temporary placement hearing on December 4, 2009, although the transcript of the hearing is not included in the record on appeal. The

hearing apparently resulted in T.S.W.'s prospective adoptive placement with the non-Indian family selected by Mother. It is unclear from the record whether the district court considered if good cause existed to deviate from ICWA's foster care and preadoptive placement preferences under 25 U.S.C. § 1915(b) before issuing a temporary placement order.

The record on appeal contains a pretrial order filed on January 12, 2010, reflecting a pretrial conference held on December 29, 2009. The pretrial order identifies the "Nature of hearing" as a "Termination of Parental Rights."

Also on January 12, 2010, the district court conducted a hearing on the Agency's petition to terminate Father's parental rights. Again, although the record on appeal contains no transcript of the hearing, it appears that at the conclusion of the hearing, the district court ruled from the bench, terminating Father's parental rights. However, the district court did not issue a written order terminating Father's parental rights until March 11, 2010.

On January 26 and 27, 2010, the district court conducted a hearing on the Agency's petition to deviate from ICWA's placement preferences. At the close of the hearing, the district court orally ruled from the bench, deviating from ICWA's placement preferences based primarily upon Mother's desire that the child be placed with the adoptive couple she had chosen and Mother's threat to withdraw her consent to the adoption if her choice was not approved.

At the close of the hearing, the district court asked the Agency's counsel to draft and circulate a journal entry memorializing the court's finding within 10 days and indicated that if the parties did not sign the journal entry within 4 days after circulation, the court would sign the journal entry without signatures. The court stated: "I wanna make sure that this case keeps moving and it's not sitting around for a couple of months waiting for the journal entry."

However, the journal entry formalizing the district court's decision was not filed until more than 2 months later, on April 15, 2010. In the meantime, as discussed below, counsel for the Agency in this case apparently filed a separate adoption proceeding in district court. In that separate proceeding, counsel represented the

adoptive parents chosen by Mother and, without notice to the Tribe, obtained a final decree of adoption of T.S.W.

In its April 15, 2010, journal entry, the district court found good cause existed to deviate from ICWA. Like the "petition" for deviation filed by the Agency, the journal entry contains neither a statutory reference to ICWA nor a description of ICWA's placement preferences. Further, the journal entry does not specify whether the deviation is for temporary or adoptive placement. Nevertheless, in the journal entry the district court held: "Birth parents can revoke their consent at any time for any reason; and the birth Mother has final say." Further, the district court conclusively stated that the "[b]irth mother's preference is good cause under ICWA to deviate from the prescribed placement preferences."

The Tribe appealed the district court's April 15, 2010, order granting a deviation from ICWA's placement preferences. The appeal was transferred from the Court of Appeals to this court pursuant to K.S.A. 20-3018(c).

*Show Cause Order*

Prior to oral argument, this court issued a show cause order advising the parties that the record contained insufficient information for the court to verify its jurisdiction to hear the appeal. Specifically, the court noted the record contained no petition for adoption or final adoption decree, and the court directed the parties to address the finality of the order appealed from under K.S.A. 2011 Supp. 59-2401a(a)(1).

In response to the show cause order, the Tribe pointed out that the district court's journal entry finding good cause to deviate from ICWA's placement preferences was the final docket entry in the district court, other than appeal-related filings. The Tribe also noted that while the Agency had advised the Tribe that T.S.W. was adopted "a long time ago," the Tribe received no notice of the adoption and assumed it occurred "under a different case number." Finally, the Tribe advised that it had requested that the Agency provide confirmation of T.S.W.'s final adoption, but the Agency had not responded to its request.

In its "Response [to Show Cause Order] and Motion to Dismiss Appeal," the Agency argued this appeal should be dismissed for lack of jurisdiction because the Tribe did not appeal the termination of Father's parental rights and because the court's decision regarding placement deviation was not an appealable order under "K.S.A. 59-2401 [*sic*]" or K.S.A. 60-2102. However, the Agency's response did not address whether a separate adoption proceeding had been filed or a final adoption decree issued.

Nevertheless, during oral argument in this appeal, counsel for the Agency conceded that prior to the expiration of the appeal time in this action, he filed a petition to adopt T.S.W. in a separate proceeding and in that proceeding, he represented the adoptive parents chosen by Mother. Counsel represented at argument that the same judge that granted the deviation from ICWA in this case also entered a final adoption decree in the adoption proceeding. Finally, the Agency's counsel conceded he did not notify or communicate with the Tribe about T.S.W.'s adoption until after this court entered its show cause order, when he advised the Tribe's counsel that the adoption "happened a long time ago."

## ANALYSIS

On appeal, the Tribe argues the district court erred in finding good cause to deviate from ICWA's placement preferences as set forth in 25 U.S.C. § 1915. But before considering this issue, we must determine whether we have jurisdiction to hear this appeal in light of the unique procedural posture presented by this case.

The Tribe concedes that the Agency filed this action as a petition to terminate Father's parental rights and that no party appealed the district court's order terminating Father's rights. The Tribe also concedes that no party filed a petition for an adoption proceeding in this case. Nevertheless, the Tribe urges us to find that this was a "de facto" adoption proceeding and that the district court entered a final decision satisfying all issues with respect to the Tribe when it deviated from ICWA's placement preferences. In the alternative, and as further discussed below, the Tribe urges us to apply the collateral order doctrine, which permits an exception to the final order requirement in limited circumstances.

As discussed above, although the Agency had not previously raised a jurisdictional issue, it now contends this appeal should be dismissed for lack of jurisdiction. The Agency does not elaborate on the basis for dismissal other than to point out that no party appealed the order terminating Father's parental rights. Further, the Agency suggests the district court's decision permitting deviation from ICWA was not a final, appealable order under K.S.A. 2011 Supp. 59-2401 or K.S.A. 2011 Supp. 60-2102.

*The collateral order doctrine provides a jurisdictional basis for this appeal.*

We exercise unlimited review over jurisdictional issues, *Shipe v. Public Wholesale Water Supply Dist. No. 25*, 289 Kan. 160, 165, 210 P.3d 105 (2009), and we have a duty to question jurisdiction on our own initiative. When the record discloses a lack of jurisdiction, we must dismiss the appeal. *State v. Gill*, 287 Kan. 289, 294, 196 P.3d 369 (2008).

The right to appeal is entirely statutory and is not a right contained in the United States or Kansas Constitutions. *Kansas Medical Mut. Ins. Co. v. Svaty*, 291 Kan. 597, 609, 244 P.3d 642 (2010). Subject to certain exceptions, Kansas appellate courts have jurisdiction to entertain an appeal only if the appeal is taken within the time limitations and in the manner prescribed by the applicable statutes. *Gill*, 287 Kan. at 294.

This action was filed pursuant to the Kansas Adoption and Relinquishment Act (KARA), K.S.A. 59-2111 *et seq.* The KARA falls within the Kansas Probate Code and permits an appeal by "an interested party" from the district court to the appellate court of "any final order, judgment or decree entered in any proceeding pursuant to: . . . The Kansas adoption and relinquishment act." K.S.A. 2011 Supp. 59-2401a(b)(1).

Although the probate code does not define the phrase "final order, judgment or decree," we derive guidance from the Kansas Code of Civil Procedure. See K.S.A. 2011 Supp. 59-2401a(b) (appeal procedures under the probate code are governed by article 21 of chapter 60 of the Kansas Statutes Annotated); *In re Guardianship of Sokol*, 40 Kan. App. 2d 57, 61, 189 P.3d 526 (2008).

Under the civil code, an appeal may be taken to the Court of Appeals as a matter of right from any "final decision." K.S.A. 2011 Supp. 60-2102(a)(4). A "final decision" generally disposes of the entire merits of the case and leaves no further questions or the possibility of future directions or actions by the court. We have noted that the phrase "final decision" is self-defining and refers to an order that definitely terminates a right or liability involved in an action or that grants or refuses a remedy as a terminal act in the case. *Flores Rentals v. Flores*, 283 Kan. 476, 481-82, 153 P.3d 523 (2007).

As noted, this case presents to us in an unusual procedural posture, making application of the "final decision" analysis difficult. The parties concede that the Agency filed this action to terminate Father's parental rights and not as an adoption proceeding. The pretrial order verifies that the sole purpose of the underlying proceeding was to terminate Father's rights. Yet no party appealed the district court's order terminating Father's parental rights. Further, for reasons not apparent from the record, the district court entertained the Agency's "petition" to deviate from ICWA's adoptive placement preferences, although the petition did not indicate that the Agency sought temporary or adoptive placement of the Indian child. See 25 U.S.C. § 1915. Nevertheless, the Tribe now appeals from the district court's order granting that deviation.

We have construed the phrase "final decision" as a decision " ' "which finally decides and disposes of the entire merits of the controversy, and reserves no further questions or directions for the future or further action of the court." ' " *Kansas Medical Mut. Ins. Co.*, 291 Kan. at 610 (quoting *Gulf Ins. Co. v. Bovee*, 217 Kan. 586, 587, 538 P.2d 724 [1975]). Here, the district court's decision to deviate from ICWA's placement preferences clearly anticipates further action—specifically, T.S.W.'s placement with an adoptive family.

We are unwilling to find, as the Tribe urges us to do, that this was a "de facto" adoption proceeding. Significantly, the Tribe cites no authority for this novel approach, and we have found none. Further, this suggestion ignores the information gleaned from the show cause order issued by this court—*i.e.*, that the adoptive cou-

ple chosen by Mother filed a separate proceeding and obtained a decree of adoption in that proceeding, albeit without notice to the Tribe, while the instant action was still pending. Thus, the underlying action clearly was not intended by the Agency or understood by the court to be a "de facto" adoption proceeding.

Finally, we note that neither party suggests that this appeal is legislatively authorized as an interlocutory appeal under K.S.A. 2011 Supp. 60-2102.

Under the circumstances presented here, we conclude the district court's order permitting a deviation from ICWA's placement preferences did not dispose of the entire merits of the case and left open the possibility of future action by the district court with respect to T.S.W.'s placement. Thus, the Tribe has not appealed from a "final order, judgment or decree" under K.S.A. 2011 Supp. 59-2401a(b)(1), and we lack statutory authority to hear this appeal.

But that holding does not end our analysis. Alternatively, the Tribe urges us to exercise jurisdiction under the collateral order doctrine. That doctrine, which we sparingly apply, provides a narrow exception to the final order requirement. It "allows appellate courts to reach 'not only judgments that "terminate an action," but also a "small class" of collateral rulings that, although they do not end the litigation, are appropriately deemed "final." [Citation omitted.]' " *Kansas Medical Mut. Ins. Co.*, 291 Kan. at 611-12 (quoting *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. ___, 130 S. Ct. 599, 605, 175 L. Ed. 2d 458 [2009]).

As the doctrine is applied in Kansas, an order may be collaterally appealable if it (1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment. *Kansas Medical Mut. Ins. Co.*, 291 Kan. at 612.

Here, the district court's decision conclusively determined the disputed issue—*i.e.*, whether to permit deviation from ICWA's placement preferences. Further, we are satisfied that at least in this case, which was filed as an action to terminate Father's parental rights, the district court's decision granting deviation from ICWA's placement preferences resolved an issue wholly separate from the merits of the proceeding.

We are persuaded that the third factor—whether the disputed issue will be effectively unreviewable upon appeal from a final judgment—also was met in this case in light of the separate adoption proceeding filed without notice to the Tribe. As the Tribe pointed out at oral argument, if we decline to review the district court's deviation from ICWA's placement preferences, that decision will be effectively unreviewable because of the Agency's action in proceeding with a final adoption without notice to the Tribe.

Based upon the unique factual circumstances of this case, we conclude the district court's order permitting deviation from ICWA's placement preferences falls within that "small class" of collateral rulings that, although it did not end the litigation, is appropriately deemed "final."

Having determined we have jurisdiction to hear this appeal, we turn to the merits of the underlying issue.

*The district court erred in deviating from ICWA's placement preferences.*

On appeal, the Tribe argues the district court abused its discretion in finding good cause to deviate from ICWA's placement preferences because the Agency: (1) failed to make reasonable efforts to seek placement within ICWA's placement preferences beyond requesting the Tribe provide families that complied with the preferences and could meet the Agency's fees of $27,500; (2) failed to impartially consider T.S.W.'s relatives for placement; and (3) offered non-ICWA placement options to Mother prior to offering the remaining ICWA-compliant families offered by the Tribe.

Further, the Tribe contends the district court erred in basing its good cause finding on Mother's promise to withdraw her consent to the adoption if she was not allowed to choose the adoptive family. The Tribe contends Mother's threat to withdraw her consent and/or her choice of adoptive parents cannot override ICWA's mandatory placement preferences. Instead, the Tribe reasons that Mother's preferences are relevant only in limited circumstances not present here.

The Agency does not argue that it complied with ICWA's placement preferences. Rather, the Agency essentially contends that

while it attempted to comply with the second placement preference, Mother's preference to place her child with non-Indian parents ultimately provided good cause to deviate from ICWA's preferences. Alternatively, the Agency argues ICWA does not apply to a non-Indian biological parent's voluntary placement of their child with a non-Indian adoptive family.

We review a district court's finding that good cause exists to deviate from ICWA's placement preferences for abuse of discretion. *In re Adoption of B.G.J.*, 281 Kan. 552, 564, 133 P.3d 1 (2006) (finding that the district court abuses its "substantial discretion" if it fails to properly apply the ICWA factors).

"Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

This case also may require interpretation of ICWA. Interpretation of a statute is a question of law over which we exercise unlimited review. *In re A.J.S.*, 288 Kan. 429, 431, 204 P.3d 543 (2009).

*ICWA's placement preferences extend to voluntary placements by a non-Indian parent.*

Before considering whether the district court correctly applied ICWA's placement preferences here, we first briefly consider what appears to be an alternative argument by the Agency. Although not precisely formulated, the Agency contends ICWA's placement preferences should not be applied to the situation presently before us, *i.e.*, where a non-Indian biological parent has voluntarily consented to the placement of her Indian child with a non-Indian family. Without benefit of authority, the Agency reasons:

"The most troubling aspect to the Cherokee Nation's position is the attempt to use the Act to usurp the prenatal rights of a fit non-Indian mother to determine the best interest of her child. The Act was designed to prevent the unfair forcible removal of Indian children from their own homes and place them with non-Indian adoptive parents. Here, the Cherokee Nation attempts to use the placement pref-

erences in an involuntary removal to overrule the placement desires of the fit non-Indian mother in a voluntary placement."

But the Agency's argument is contrary to the explicit language of 25 U.S.C. § 1915(a), which makes ICWA's placement preferences applicable to "any adoptive placement of an Indian child." Moreover, this issue was resolved, albeit in a different context, by the United States Supreme Court in *Mississippi Choctaw Indian Band v. Holyfield*, 490 U.S. 30, 109 S. Ct. 1597, 104 L. Ed. 2d 29 (1989). There, the Mississippi Band of Choctaw Indians argued ICWA's jurisdictional provisions applied to an attempt by the biological Indian parents of twins to consent to their adoption by a non-Indian family. The tribe argued that the twins, like their parents, were "domiciled" on the reservation and the tribe had exclusive jurisdiction over their placement.

In *Holyfield*, the Supreme Court found that at the time of their birth, the twins were domiciled—like their parents—on the reservation. 490 U.S. at 48-49. In so holding, the Court noted that tribal jurisdiction under ICWA "was not meant to be defeated by the actions of individual members of the tribe, for Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large numbers of Indian children adopted by non-Indians." 490 U.S. at 49. The Court reasoned:

"[I]t is clear that Congress' concern over the placement of Indian children in non-Indian homes was based in part on evidence of the detrimental impact on the children themselves of such placements outside their culture. *Congress determined to subject such placements to the ICWA's jurisdictional and other provisions, even in cases where the parents consented to an adoption, because of concerns going beyond the wishes of individual parents.*" (Emphasis added.) 490 U.S. at 49-50.

Thus, the Supreme Court in *Holyfield* held ICWA's jurisdictional provisions apply even when both biological parents voluntarily attempt to place their Indian child with a non-Indian family. Further, the Court expressly extended its jurisdictional holding to ICWA's "other provisions," which include the placement provision at issue here, 25 U.S.C. § 1915(a). 490 U.S. at 49-50.

We also reject the Agency's implied suggestion that ICWA's placement preferences apply only when the parental rights of Indian parents are at issue. Simply stated, this argument is inconsistent with our recent holding in *In re A.J.S.* There, we abandoned the existing Indian family doctrine and held ICWA's placement preferences applied to the placement of A.J.S., who had both Indian and non-Indian heritage. 288 Kan. at 442.

*The Agency did not comply with ICWA's placement preferences.*

Although the district court's order deviating from ICWA's placement preferences did not identify or discuss the preferences, the language of the statute at issue, 25 U.S.C. § 1915(a), is a good place to start with our analysis. That statute provides:

"In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." 25 U.S.C. § 1915(a).

It is undisputed that T.S.W. is an Indian child as defined in ICWA. See 25 U.S.C. § 1903(4) (2001) (an "Indian child" is an unmarried person under the age of 18 who is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe). Thus, in any "adoptive placement" involving T.S.W., ICWA required the court to consider the three placement preferences specified in § 1915(a) in the order specified in the statute absent good cause to the contrary. Further, the burden was on the Agency, as the party urging deviation from the preferences, to establish good cause to do so. See Bureau of Indian Affairs Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,594, 67,595 (November 26, 1979) (hereinafter "BIA Guidelines").

In this case, we need not extensively consider whether the Agency followed the placement preferences before seeking a deviation from those preferences. It did not. While the Agency made some effort to satisfy the second placement preference when it requested the Tribe provide available adoptive family profiles, the Agency impermissibly qualified its request in at least two ways. First, the Agency provided the Tribe with Mother's extensive "cri-

teria" for any prospective adoptive family. Second, the Agency specified that prospective adoptive families be able to pay the Agency's $27,500 fee requirement. And while the Agency eventually indicated a willingness to modify its fee based on an unspecified sliding scale, the parties never agreed as to the parameters of that scale because Mother chose a non-Indian family based on profiles presented to her from the Agency.

Essentially, the Agency grafted its substantial fee requirement as well as Mother's placement criteria (which ironically specified that the adoptive parents be Caucasian) onto ICWA's placement preferences. Common sense dictates that ICWA's placement preferences cannot be undermined in this manner. In fact, the Agency's actions appear to fly in the face of Congress' intent in enacting ICWA. See *Holyfield*, 490 U.S. at 37 (ICWA " 'seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society' . . . by establishing 'a Federal policy that, where possible, an Indian child should remain in the Indian community' " and ensuring that Indian child welfare determinations are not based on a white, middle-class standard that often forecloses placement with an Indian family).

Moreover, even if we could conclude that the Agency appropriately and thoroughly attempted to comply with ICWA's second placement preference, it is undisputed that it made no effort to comply with ICWA's first and third preferences. Regarding the first preference—placement with the child's extended family—an Agency employee testified that because Mother did not want T.S.W. to be placed with Father's extended family, the Agency did not ascertain whether such placement was possible. Further, it is undisputed that the Agency made no effort to ascertain the availability of placement with other Indian families—the third placement preference.

Instead, the district court found "good cause" under this statute to deviate from the placement preferences, permitting T.S.W.'s placement with a non-ICWA compliant family. Therefore, we are asked to decide whether a biological parent's preference for place-

ment of an Indian child can provide good cause to override ICWA's placement preferences.

This is not an issue of first impression for this court. In *B.G.J.*, we considered whether the district court abused its discretion in finding good cause to deviate from ICWA's adoptive placement preferences in granting a non-Indian family's petition to adopt an Indian child. Both parties here rely on *B.G.J.* to support their opposing positions regarding whether the district court properly found good cause to deviate from ICWA's placement preferences in this case. For reasons discussed below, we conclude *B.G.J.* does not support the district court's deviation from ICWA here.

*The B.G.J. case does not support the district court's finding of good cause to deviate from ICWA's placement preferences in this case.*

In *B.G.J.*, the tribe offered placement of the Indian child, B.G.J., with four of her biological mother's relatives. But the mother, who was one-half Indian, selected a non-Indian family profile from an adoption agency because she "did not want a member of the Tribe to raise B.G.J." 281 Kan. at 555. After the prospective adoptive couple petitioned to adopt B.G.J., the district court found good cause to deviate from ICWA's placement preferences.

On review, this court held the district court did not abuse its discretion in finding good cause to deviate from ICWA's placement preferences. 281 Kan. at 566. The court first noted that 25 U.S.C. § 1915(c) provides that " '[w]here appropriate, the preference of the Indian child or parent shall be considered' " and that the tribe contended that appropriateness must be assessed in light of the congressional intent to protect the best interest of Indian children and promote the stability of Indian tribes and families. 281 Kan. at 565.

But the *B.G.J.* court pointed out that while placing Indian children with Indian families is a priority under ICWA, the legislation also provides that for good cause, courts may deviate from the placement preferences, allowing "the state courts flexibility in the placement of Indian children." 281 Kan. at 565. The court then noted that the BIA Guidelines, specifically BIA Guideline F.3.,

permit a court to rely on "parental preference" in deviating from ICWA's placement preferences. The *B.G.J.* court noted:

"It [BIA Guideline F.3] states that the good cause determination 'shall be based on *one* or more of the considerations.' (Emphasis added.) It does not limit the consideration which may be given to the mother's preference. Here, the mother knowingly and with full knowledge of the ICWA preferences executed her relinquishment. She was adamant that her child be placed with the adoptive parents, and not with her extended family or the Tribe." 281 Kan. at 565.

Relying upon this language in this case, the Agency contends *B.G.J.* supports the district court's decision to deviate from ICWA based upon Mother's "strong desire to place with the adoptive couple of her choosing." However, we do not read *B.G.J.* so narrowly.

While *B.G.J.* emphasized the mother's preference, it also specifically noted that the district court based its determination on two of the three factors suggested by BIA Guideline F.3. as a basis for deviation from the guidelines. The court concluded:

"B.G.J. had no extraordinary physical or emotional needs. Hence, the trial court based its determination on the other two factors. *Giving as much if not more weight to the unavailability of suitable families offered by the Tribe for placement as to the birth mother's request*, the trial court determined that good cause existed to deviate from the statutory preferences. The trial court's analysis is in accord with the federal statutes and guidelines. We hold the district court did not abuse its discretion in finding that good cause existed to deviate from ICWA's placement preferences." (Emphasis added.) 281 Kan. at 565-66.

Thus, this court in *B.G.J.* did not base its decision to deviate from ICWA's placement preferences solely, or even mostly, on the mother's placement preference. But to the extent our opinion in *B.G.J.* can be read to suggest that a parent's preference can solely override ICWA's placement preferences, we disapprove that language as dicta.

Further, we find *B.G.J.* distinguishable in several key respects. Significantly, although the birth mother did not want B.G.J. placed with extended family, the district court made fairly extensive findings of fact and conclusions of law regarding the unsuitability of the four relatives offered by the tribe as potential placements for B.G.J. This court then relied on those findings in concluding the

district court did not abuse its discretion in deviating from the placement preferences. 281 Kan. at 566.

In contrast, in this case the district court made no such findings regarding the availability of placement with either natural parent's extended family or the availability of Tribe families. Instead, the court expressly noted that "[n]either of [the birth mother's or birth father's] families were [*sic*] considered as the birth mother did not want placement with them." And regarding the Cherokee Nation families offered by the Tribe, the court held: "An additional seventeen (17) to twenty (20) families were presented which the birth mother did not like and rejected." Significantly, the court further commented that "[t]here is no evidence to show that any of these families were disqualified for any legal or practical reason."

Thus, the district court in this case did not rely upon the unavailability of either T.S.W.'s extended family or the families offered by the Tribe. Instead, the court permitted Mother's desire not to place T.S.W. with extended family or any of the potential adoptive Tribe families to override these preferences.

*B.G.J.* is distinguishable in another significant respect. Namely, the district court there considered whether to deviate from ICWA's placement preferences in the context of an adoption proceeding filed by the adoptive parents chosen by the mother. In ultimately determining that placement with the adoptive parents served the best interest of the child, the district court pointed out that the adoptive parents were experienced parents and foster parents who were socially and economically stable and who had provided a social assessment (unlike the extended family members offered by the tribe in that case). Further, the district court found that B.G.J. had "admittedly bonded with" the adoptive family, with whom the child was placed shortly after birth. 281 Kan. at 558-59.

The Agency points out that the district court in this case also referenced "the best interest of the child" in deviating from the placement factors. However, unlike in *B.G.J.*, the district court's reference to the best interest of the child in this case was not made in the context of an adoption proceeding, since no such proceeding had been filed. In fact, the court's order makes no reference whatsoever to T.S.W.'s temporary placement or to the potential adop-

tive parents other than to indicate that the "subject minor child has been with the prospective adoptive couple since December 2009." Thus, the court's reference to the "best interest of the child" is confusing at best and appears to be based, like the court's other conclusions, on Mother's placement preference.

Because of its distinct facts, procedural context, and holding, we conclude *B.G.J.* does not support the district court's decision in this case to deviate from ICWA based solely on Mother's preference to place T.S.W. with a non-Indian family of her choice. Therefore, we next consider whether the district court's holding can stand under the factual circumstances of this case.

*"Parental preference" has limited application in considering good cause to deviate.*

The Tribe contends the parental preference referred to in 25 U.S.C. § 1915(c) has only limited application and is not meant to entirely override the placement preferences of § 1915(a). Specifically, the Tribe argues that parental preference can support a finding of good cause to deviate from the order of consideration of ICWA's placement preferences only in the limited situation in which the consenting parent desires anonymity. In support, the Tribe points to the complete text of 25 U.S.C. § 1915(c), BIA Guidelines F.1. and F.3., and the commentary to those guidelines.

Notably, the Agency entirely fails to respond to this argument and instead relies simply on this court's decision in *B.G.J.* as support for its contention that 25 U.S.C. § 1915(c) permits a parent's preference to override the placement preferences of 25 U.S.C. § 1915(a). But we were not presented in *B.G.J.* with the argument that the parental preference provision of 25 U.S.C. § 1915(c) is limited to situations in which a consenting parent requests anonymity with respect to the placement of the child. Nor are we precluded from considering that issue now.

Significantly, in *B.G.J.* we recognized that 25 U.S.C. § 1915(c) provides *in part* that where appropriate, in considering the placement preferences of 25 U.S.C. § 1915(a), "the preference of the Indian child or parent shall be considered." 281 Kan. at 565. But we did not consider the entire text of subsection (c). Instead, we

omitted the proviso to that subsection which lends context and meaning to the scope of the parental preference language. Specifically, § 1915(c) states in full:

"In the case of a placement under subsection (a) or (b) of this section, if the Indian child's tribe shall establish a different order of preference by resolution, the agency or court effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child, as provided in subsection (b) of this section. Where appropriate, the preference of the Indian child or parent shall be considered: *Provided,* That where a consenting parent evidences a desire for anonymity, the court or agency shall give weight to such desire in applying the preferences."

Thus, the entire text of 25 U.S.C. § 1915(c) indicates that a district court should modify the order of preferences in 25 U.S.C. § 1915(a) when (1) the tribe establishes a different order under certain circumstances or (2) a consenting parent seeks anonymity with respect to the placement of the child.

This interpretation is bolstered by BIA Guideline F.1. That guideline, which also was not discussed in *B.G.J.*, closely tracks 25 U.S.C. § 1915(a) and (c). BIA Guideline F.1.(c) provides: *"Unless a consenting parent evidences a desire for anonymity,* the court or agency shall notify the child's extended family and the Indian child's tribe that their members will be given preference in the adoption decision." (Emphasis added.) BIA Guidelines, 44 Fed. Reg. 67,594 (November 26, 1979). See also *In re M.F.,* 290 Kan. 142, 143, 225 P.3d 1177 (2010) (recognizing BIA guidelines should be considered by district courts in applying ICWA).

The commentary to BIA Guideline F.1. further explains that § 1915(a):

"makes clear that preference shall be given in the order listed in the Act. The Act clearly recognizes the role of the child's extended family in helping to raise children. The extended family should be looked to first when it becomes necessary to remove the child from the custody of his or her parents. . . .

. . . .

"The third subsection [of Guideline F.1.] recommends that the court or agent make an active effort to find out if there are families entitled to preference who would be willing to adopt the child. This provision recognizes, however, that the *consenting parent's request for anonymity* takes precedence over efforts to find a home consistent with the Act's priorities." (Emphasis added.) BIA Guidelines, 44 Fed. Reg. 67,594 (1979).

While we did not discuss the full text of 25 U.S.C. § 1915(c) or BIA Guideline F.1. in *B.G.J.*, we did consider BIA Guideline F.3., which discusses the meaning of the term "good cause." 281 Kan. at 565. We pointed out that the guideline should be considered by district courts when deciding whether to deviate from ICWA's placement preferences in an adoptive placement. BIA Guideline F.3. provides:

"(a) For purposes of foster care, preadoptive or adoptive placement, a determination of good cause not to follow *the order of preference* set out above shall be based on one or more of the following considerations:

(i) The request of the biological parents or the child when the child is of sufficient age.

(ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.

(iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.

"(b) The burden of establishing the existence of good cause *not to follow the order of preferences* established in subsection [F.2.](b) shall be on the party urging that the preferences not be followed." (Emphasis added.) BIA Guidelines, 44 Fed. Reg. 67,594 (November 26, 1979).

However, we did not discuss in *B.G.J.* the relevant commentary to BIA Guideline F.3., which again supports the Tribe's argument regarding the limitations of the parental preference language: "The Act indicates that the court is to give *preference to confidentiality requests* by parents in making placements. Paragraph (i) is intended to permit parents to ask that the *order of preference* not be followed because it would *prejudice confidentiality* or for other reasons." (Emphasis added.) BIA Guidelines, 44 Fed. Reg. 67,594.

We should point out that while we did not discuss the confidentiality issue in *B.G.J.*, it appears that confidentiality may have been relevant there. The Court of Appeals panel noted that mother did not disclose her pregnancy and extended family members were unaware of the pregnancy until the child's birth. See *In re Adoption of B.G.J.*, 33 Kan. App. 2d 894, 905, 111 P.3d 651, *rev. granted* 280 Kan. 982 (2005). Thus, the panel speculated that mother's confidentiality may have been the reason none of the prospective adoptive family members were subjected to social assessments be-

fore being considered as possible placement for the child. 33 Kan. App. 2d at 905.

In any event, in light of the text of 25 U.S.C. § 1915(c), BIA Guidelines F.1. and F.3., and the commentary to both of those guidelines, we are persuaded that the "parental preference" referred to in § 1915(c) was not intended to permit a biological parent's preference for placement of a child with a non-Indian family to automatically provide "good cause" to override the adoptive placement preferences of 25 U.S.C. § 1915(a). Instead, a parent's request for anonymity with respect to placement of the child must be considered along with other relevant factors, including the best interest of the child, in deciding whether to modify the order of consideration of ICWA's placement references. See *B.G.J.*, 281 Kan. at 565 (holding that "[t]he best interest of the child remains the paramount consideration, with ICWA preferences an important part of that consideration").

Our holding is consistent with at least one other jurisdiction that has analyzed and considered the confidentiality aspect of 25 U.S.C. § 1915(c)'s parental preference provision. In *Matter of M.B.*, 350 Mont. 76, 82, 204 P.3d 1242 (2009), the Montana Supreme Court concluded the commentary to BIA Guideline F.3. "indicates the purpose of this exception is to protect the biological parents' confidentiality, if they so choose." Because the biological parents did not seek to protect their confidentiality in that case, the court held the exception did not apply to the parents' request that their children be placed with their current foster family. 350 Mont. at 82-83. But see *In re B.B.A.*, 224 P.3d 1285, 1287-88 (Okla. App. 2009) (holding that the "persuasive language" of BIA Guideline F.3. "authorizes reliance upon only one factor to establish the existence of good cause" and that one factor could be the request of the biological parents).

Returning to the facts of this case, we note that the record contains no indication that Mother requested confidentiality with respect to T.S.W.'s placement. Rather, Mother simply did not want T.S.W. placed with Father's extended family members or members of the Tribe. Applying the above analysis, we conclude the district court erred in permitting Mother's preference to override ICWA's

placement factors absent some request for confidentiality. Accordingly, we reverse the district court's decision deviating from ICWA's placement preferences in this case.